**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**LUFKIN DIVISION**

DENNIS WAYNE HOPE,

                Plaintiff,

     v.

TODD HARRIS,
CHAD REHSE,
LEONARD ECHESSA,
JONI WHITE,
KELLY ENLOE,
MELISSA BENNETT,
BONNIE FIVEASH,
[Unknown First Name] SIMMONS,
[Unknown First Name] CLARK,

              Defendants.

Civil Action No.  9:18-CV-00027

**<u>SECOND AMENDED COMPLAINT</u>**

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................1

PARTIES ............................................................................................................8

JURISDICTION & VENUE .............................................................................11

FACTUAL ALLEGATIONS ............................................................................11

I.    MR. HOPE WAS CONFINED TO SEGREGATION FOR 27 YEARS
      AFTER BEING DESIGNATED AN ESCAPE RISK IN 1995 .......................11

II.   THE PROCESS USED TO REVIEW MR. HOPE'S SEGREGATION WAS
      REPEATEDLY INTERFERED WITH, RENDERING IT MEANINGLESS................14

      A.    Mr. Hope Was Entitled To Meaningful Reviews Of His Segregation
            Placement ..............................................................................................14
      B.    In 2005, TDCJ Removed Mr. Hope's Escape Risk Designation ..........................15
      C.    In 2007, The SCC Decided Mr. Hope "Shall" Be Released From
            Solitary, But That Decision Was Reversed Without Explanation ........................16
      D.    Mr. Hope Expressed His Concerns To The SCC And TDCJ Officials ................17
      E.    The SCC "Lost" Its Copy Of The 2007 Decision Approving Mr.
            Hope's Release To General Population ...............................................................18
      F.    Administrators Dangled A Release From Solitary—If Mr. Hope
            Behaved With The Media ......................................................................................19
      G.    In 2010, The SCC Again Decided Mr. Hope "Shall" Be Released To
            General Population—Yet Again Mr. Hope Was Left In Solitary
            Indefinitely ...........................................................................................................19

III.  THE CLASSIFICATION DEFENDANTS ENTERED A CONSPIRACY TO
      RETALIATE AGAINST MR. HOPE ..............................................................20

      A.    The Grievance Process Provided No Meaningful Opportunity For
            Appeal ...................................................................................................................22
      B.    The Classification Defendants Grew Angry With Mr. Hope's Outreach ............23
      C.    Mr. Hope Upset Officers By Questioning Improper Disciplinary Cases .............25

IV.   THE CLASSIFICATION DEFENDANTS EXPANDED THEIR
      AGREEMENT TO SEGREGATE MR. HOPE INDEFINITELY, AND
      TRIED TO SHIELD THEMSELVES FROM SCRUTINY ...............................26

      A.    Major McMullen Provided The Classification Defendants With
            Another Excuse To Keep Mr. Hope In Segregation ............................................27

|   | B. | In February 2012, The Conspirators Directed An Improper Confiscation Of Mr. Hope's Property And Planted A Screwdriver In His Cell | 28 |
|   | C. | Minutes Later, The Conspirators Sent Officers After The Planted "Weapon" And Repeatedly Deployed A Chemical Agent | 30 |

V. MR. HOPE CONTINUED TO CHALLENGE HIS MISTREATMENT AS DEFENDANTS TRIED TO SILENCE HIM .................................................... 32

|   | A. | Mr. Hope Continued Speaking Out Against His Mistreatment | 32 |
|   | B. | The Conspirators Implemented Constant Cell Moves That Unsettled Mr. Hope And Exposed Him To Inhumane Conditions | 33 |

VI. THE CLASSIFICATION DEFENDANTS ACKNOWLEDGED MR. HOPE'S SCC REVIEW HEARINGS WERE MEANINGLESS BECAUSE THEY "NEVER" PLANNED TO RELEASE HIM FROM SOLITARY ........................ 36

|   | A. | Realizing The Conspirators Went Too Far, Mr. Treon Pushed For Mr. Hope's Release—But The Conspirators Admitted Mr. Hope Would "Never" Get Out Of Segregation | 36 |
|   | B. | The Classification Defendants Upheld Their Agreement For Mr. Hope To "Never" Get Out Of Segregation | 37 |
|   | C. | Classification Defendant Bennett Joined The Classification Defendants' Agreement To Keep Mr. Hope In Solitary | 38 |

VII. MR. HOPE ENDURED MEANINGLESS REVIEWS WHILE THE CLASSIFICATION DEFENDANTS SHIFTED ATTENTION TO OTHERS ............ 39

|   | A. | Polunsky Defendant Rehse Agreed To Continue Mr. Hope's Frequent Moves, Now Into Worsening Conditions | 40 |
|   | B. | Polunsky Defendant Rehse Participated In Further SCC Review Hearings | 43 |

VIII. SCC MEMBERS REVEALED MR. HOPE'S HEARINGS WERE MERE "WELFARE CHECKS," NOT DESIGNED FOR MEANINGFUL REVIEW ............. 44

IX. MR. HOPE WAS RELEASED FROM SOLITARY BUT EXPERIENCED FURTHER MISTREATMENT .................................................................. 46

|   | A. | Mr. Hope Was Released From Solitary In 2022 Because Of The Supreme Court's Impending Review Of His Claims In This Case | 46 |
|   | B. | Mr. Hope Transitioned To Ellis Unit, And Was Met With Ellis Defendants Simmons' and Clark's Excessive Use Of Force | 48 |

X. DEFENDANTS' ACTIONS RESULTED IN PHYSICAL AND MENTAL HARM TO MR. HOPE .................................................................. 50

|   | A. | Respiratory Issues | 51 |

ii

B.    Lower Back, Shoulder, and Knee Pain ..................................................... 51
C.    Insomnia ................................................................................................... 52
D.    Other Psychological Harm ....................................................................... 53

FIRST CLAIM FOR RELIEF ............................................................................... 56

SECOND CLAIM FOR RELIEF .......................................................................... 59

THIRD CLAIM FOR RELIEF .............................................................................. 62

FOURTH CLAIM FOR RELIEF .......................................................................... 66

FIFTH CLAIM FOR RELIEF ............................................................................... 70

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Armstrong v. Manzo,*
    380 U.S. 545 (1965)....................................................................................63

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)....................................................................................66

*Bevill v. Fletcher,*
    26 F.4th 270 (5th Cir. 2022) .............................................................59, 62, 66

*Cowart v. Erwin,*
    837 F.3d 444 (5th Cir. 2016) .....................................................................70

*Davis v. Ayala,*
    576 U.S. 257 (2015).......................................................................................2

*In re Enron Corp. Sec., Derivative & ERISA Litig.,*
    623 F. Supp. 2d 798 (S.D. Tex. 2009) ......................................................67

*Farmer v. Brennan,*
    511 U.S. 825 (1994)................................................................................56, 57

*Giese v. Jackson,*
    No. 3:19-CV-00081, 2020 WL 3493078 (S.D. Tex. May 27, 2020)......................30

*Hewitt v. Helms,*
    459 U.S. 460, abrogated on other grounds by *Sandin v. Conner,* 515 U.S. 472 (1995)......2, 63

*Hope v. Harris,*
    861 F. App'x 571 (5th Cir. 2021) .............................................................46, 47, 63

*Hudson v. McMillian,*
    503 U.S. 1 (1992)....................................................................................70

*Hutto v. Finney,*
    437 U.S. 678 (1978)....................................................................................57

*Latiolais v. Cravins,*
    484 F. App'x 983 (5th Cir. 2012) .............................................................67

*Mathews v. Eldridge,*
    424 U.S. 319 (1976)....................................................................................63

*Morris v. Powell,*
    449 F.3d 682 (5th Cir. 2006) ................................................................................60

*Nesmith v. Alford,*
    318 F.2d 110 (5th Cir. 1963) ................................................................................67

*Pell v. Procunier,*
    417 U.S. 817 (1974) ..............................................................................................60

*Richardson v. Tex. Sec'y of State,*
    978 F.3d 220 (5th Cir. 2020) ................................................................................63

*Ruiz v. Estelle,*
    503 F. Supp. 1265 (S.D. Tex. 1980), *aff'd in part, rev'd in part on other grounds*, 679 F.2d 1115 (5th Cir. 1982), *amended in part, vacated in part on other grounds*, 688 F.2d 266 (5th Cir. 1982) ................................................................................................63

*Taylor v. Sterrett,*
    532 F.2d 462 (5th Cir. 1976) ................................................................................60

*United States v. Rodriguez-Lopez,*
    756 F.3d 422 (5th Cir. 2014) ................................................................................67

*United States v. Spudic,*
    795 F.2d 1334 (7th Cir.1986) ...............................................................................67

*Wilkerson v. Stalder,*
    No. 00-304-JJB, 2013 WL 6665452 (M.D. La. Dec. 17, 2013), *aff'd sub nom. Wilkerson v. Goodwin*, 774 F.3d 845 (5th Cir. 2014) ................................................................63

*Wilson v. Seiter,*
    501 U.S. 304 (1991) ..............................................................................................57

*Woods v. Smith,*
    60 F.3d 1161 (5th Cir. 1995) ................................................................................60

## STATUTES

28 U.S.C.
    § 1331 .....................................................................................................................11
    § 1343 .....................................................................................................................11
    § 1391 .....................................................................................................................11

42 U.S.C. § 1983 ...........................................................................................................*passim*

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. I .............................................................................................................59

U.S. Const. amend. VIII..........................................................................................56

U.S. Const. amend. VIII..........................................................................................70

U.S. Const. amend. XIV ..........................................................................................62

## OTHER AUTHORITIES

Alex Hanneford, *Living in a Box*, GQ, Nov. 7, 2013, available at https://www.gq-magazine.co.uk/article/solitary-confinement-american-human-rights ...................................34

*The Box: 27 Years in Solitary Confinement*, AL JAZEERA (June 27, 2023) at 13:32-14:48, https://www.aljazeera.com/program/fault-lines/2023/6/27/the-box-27-years-in-solitary-confinement....................................................................................................7, 17, 36, 37

Keri Blakinger, *4 Texas Prison Officials Indicted after Alleged Screwdriver-Planting Incident at Brazoria Lockup*, HOUSTON CHRONICLE (July 11, 2018), https://www.chron.com/news/houston-texas/article/4-Texas-prison-officials-indicted-after-alleged-13064474.php..........................................................................................30

Lauren Brinkley-Rubinstein, Josie Sivaraman, David L. Rosen, *Association of Restrictive Housing During Incarceration With Mortality After Release*, 2 JAMA OPEN NETWORK 19 (Oct. 4, 2019) .................................................................................................2, 54

Statement of Lance L. Lowry, AFSCME Texas Correctional Employees Local 3807 (Feb. 25, 2014), https://solitarywatch.org/wp-content/uploads/2014/02/Lance-Lowry-Senate-Hearing-Submission.pdf .............................................................................................54

TDCJ Administrative Segregation Plan (March 2012) at 17 (emphasis added), available at https://tifa.org/wp-content/uploads/2014/02/Administrative-Segregation-Death-Row-Plan-1.pdf ........................................................................................................15

TDCJ Offender Orientation Handbook at 7 (Feb. 2017), available at https://www.tdcj.texas.gov/documents/Offender_Orientation_Handbook_English.pdf ...15, 29

Terry A. Kupers, *The SHU Post-Release Syndrome: A Preliminary Report*, 14 CORRECTIONAL MENTAL HEALTH REP. 6 (Mar./Apr. 2016) ........................................................2, 54

Terry A. Kupers, *Supermax Prison Isolation in Pre-Crime Society*, in THE PRE-CRIME SOCIETY (Bruce Arrigo & Brian Sellers eds., 2021) .............................................................53

UN General Assembly, *United Nations Standard Minimum Rules for the Treatment of Prisoners (the Nelson Mandela Rules): Resolution / Adopted by the General Assembly*, January 8, 2016, A/RES/70/175, available at: https://www.refworld.org/docid/5698a3a44.html.......................2

## SECOND AMENDED COMPLAINT

Plaintiff Dennis Wayne Hope files this Second Amended Complaint for relief against: (1) Defendants Todd Harris and Chad Rehse, both staff at the Allan B. Polunsky Unit ("<u>Polunsky</u>") while Mr. Hope was housed there ("<u>Polunsky Defendants</u>"); (2) Defendants Leonard Echessa, Joni White, Kelly Enloe, Melissa Bennett, and Bonnie Fiveash, each part of the State Classification Committee or classification review process ("<u>Classification Defendants</u>"); and (3) Defendants Simmons and Clark, both staff involved in the response to a medical incident that occurred while Mr. Hope was at the O.B. Ellis Unit ("<u>Ellis</u>" and the "<u>Ellis Defendants</u>"); each in their personal capacity, and alleges as follows:

## INTRODUCTION

1.      For 27 years, Plaintiff Dennis Wayne Hope was confined in isolation for nearly every hour of every day, often in inhumane and unsanitary conditions. Prisoners housed in solitary confinement[1] face unique hardships within the prison system: they are cut off from the outside world and kept in a small cell with little chance to feel or see sunlight, and without contact visits or phone calls with family or friends. Those in solitary are cut off from the world within the prison too as they complete all daily activities, such as eating meals, by themselves and spend every hour of every day alone, with no chance to interact with a cell mate or other prisoners or participate in prison programming.

2.      The debilitating effects of solitary confinement, as compared to confinement in less-restrictive settings, are well-established and widely recognized by academics, prison administrators, and courts alike. In fact, these effects are so well known that Justice Kennedy

---

[1] The terms "solitary," "solitary confinement," "segregation," and "administrative segregation" (or "Ad. Seg." or "Seg.") are used interchangeably throughout this Second Amended Complaint.

1

concluded that "[y]ears on end of near-total isolation exact a terrible price." *Davis v. Ayala*, 576 U.S. 257, 289 (2015) (Kennedy, J., concurring). Those researching the "terrible price" of segregation have found the effects to be long lasting, with many prisoners experiencing post-release effects such as SHU Post-Release Syndrome[2] and an increased risk of death.[3] The United Nations suggests solitary should be limited to no more than 15 days because longer segregation likely amounts to torture.[4]

3.     In the United States, anyone housed in segregation must have meaningful opportunities to have their placement reviewed. *See Hewitt v. Helms*, 459 U.S. 460, 476, 477 n.9, abrogated on other grounds by *Sandin v. Conner*, 515 U.S. 472 (1995). In light of this requirement, the Texas Department of Criminal Justice ("TDCJ") tasks the State Classification Committee ("SCC") with reviewing the classification of anyone in segregation at a "review hearing" every six months to determine whether to release such person back into general population ("G.P.").

4.     For 27 years, Mr. Hope endured the effects of segregation. On top of the already-devastating effects of segregation, however, Mr. Hope suffered the additional trauma of meaningless review hearings, of being told he would be released from solitary only to have that decision overturned without warning, of being targeted by the system tasked with his safety for daring to question how he could be released, and of being housed in moldy cells with other people's feces.

---

[2] Terry A. Kupers, *The SHU Post-Release Syndrome: A Preliminary Report*, 14 CORRECTIONAL MENTAL HEALTH REP. 6, 81 (Mar./Apr. 2016).

[3] Lauren Brinkley-Rubinstein, Josie Sivaraman, David L. Rosen, *Association of Restrictive Housing During Incarceration With Mortality After Release*, 2 JAMA OPEN NETWORK 19 (Oct. 4, 2019).

[4] *See* UN General Assembly, *United Nations Standard Minimum Rules for the Treatment of Prisoners (the Nelson Mandela Rules): Resolution / Adopted by the General Assembly*, January 8, 2016, A/RES/70/175, available at: https://www.refworld.org/docid/5698a3a44.html.

5.     Twelve years after Mr. Hope was placed in solitary confinement, the SCC—the Committee purportedly with the power and responsibility for reviewing housing classifications—found that there was no justification for his continued segregation based on Mr. Hope's good behavior, the fact that he was no longer designated as an escape risk, and the passage of so much time.  Thus in 2007, the SCC decided to release Mr. Hope back to G.P.  However, a high-ranking TDCJ official, Robert Treon, who was still embarrassed by Mr. Hope's 1994 escape from a unit where Mr. Treon had been warden at the time, did not want Mr. Hope released to G.P.  Mr. Treon intervened to keep Mr. Hope in solitary, and Mr. Treon and a long-time colleague, Vanessa Jones, who was then with the SCC, arranged to keep Mr. Hope in segregation for the foreseeable future.

6.     Three years later in 2010, after Mr. Treon had retired, SCC member Steven Rogers again found there was no security need to keep Mr. Hope in solitary and again decided to release him to G.P.  Like before, Ms. Jones inserted herself into the process, and the decision to release Mr. Hope to G.P. was mysteriously overruled.  Concerned that the SCC's decisions had been overruled twice, and unsure what grounds were being used to keep him in solitary or what he must do to be released from segregation, Mr. Hope engaged in a number of protected First Amendment activities, including filing grievances and writing letters to anyone he thought might be able to help or shine a light on his mistreatment.  Mr. Hope contacted SCC members such as Ms. Jones, Classification Defendants Echessa, White, and Enloe, other TDCJ officials, state legislators, and sometimes members of the media.  He asked outside advocates to do the same on his behalf.

7.     The Classification Defendants, particularly Ms. White, became angered with Mr. Hope for persistently questioning how the SCC decisions to release him from solitary had been overturned outside of the available appeals process and who had authority to release him.  In

response, the Classification Defendants hatched a plan to punish Mr. Hope for his advocacy by extending his time in solitary indefinitely, or at least until they changed their minds.

8.      The Classification Defendants unlawfully and perfunctorily denied Mr. Hope's release from solitary into G.P., both directly when Classification Defendants Enloe, Bennett, and Fiveash were present at Mr. Hope's SCC review hearings, and when Classification Defendants White, Enloe, and Bennett directed their subordinates to deny Mr. Hope's release to G.P. regardless of whether Mr. Hope posed a security risk necessitating such placement. The structure and substance of these "hearings" broke with TDCJ's own policy and revealed the periodic review hearings to be nothing more than sham proceedings that frequently lasted no more than a few minutes. In reality, the Classification Defendants had no intention of releasing Mr. Hope from solitary confinement and the only purpose of the review hearings was to tell Mr. Hope he would remain segregated, frequently without stating any reason for the decision—a fact SCC member Trevino admitted to Mr. Hope years later when he revealed Mr. Hope's review hearings were mere "welfare checks" and not intended to evaluate his classification.

9.      Again breaking with policy, the Classification Defendants disclaimed authority to transfer Mr. Hope to G.P, each pointing their finger in a different direction but providing no explanation for the inconsistency. At various times, SCC members indicated to Mr. Hope that they thought he should return to G.P. but claimed that either (1) their judgment was overridden outside of the SCC review hearing or (2) there was nothing they could do to put their judgment into action. Mr. Hope did not receive notice of the basis for these out-of-hearing reversals and had no meaningful opportunity to appeal or contest them.

10.     These improper review hearings led Mr. Hope to file grievances and contact officials to question the review process. Over time, Mr. Hope and his advocates challenged the

4

legitimacy of his review hearings with increasing frequency and to increasingly higher-level officials within and outside the prison system. Mr. Hope had proven his ability to bring outside attention to TDCJ before: in or around 2009, when one of Mr. Hope's advocates alerted then-Texas Senator Whitmire that Mr. Treon had housed Mr. Hope in death row at Polunsky, Senator Whitmire intervened on Mr. Hope's behalf to have TDCJ remove Mr. Hope from death row to a different segregation housing section. Now faced with the possibility that Mr. Hope again would catch the attention of people at the highest levels of TDCJ or of someone outside of TDCJ, the Classification Defendants expanded their agreement into a multifaceted scheme whereby they attempted to silence Mr. Hope and his advocates. They also arranged for manufactured disciplinary charges against Mr. Hope to provide a ready-made excuse to parrot to Mr. Hope, his advocates, and anyone else who asked why Mr. Hope was still segregated.

11. To manufacture the disciplinary charges against Mr. Hope and make his daily life increasingly uncomfortable, the Classification Defendants needed to work with a Polunsky officer. They found willing participants, first in Major Virgil McMullen and later in Polunsky Defendant Major Rehse. The coordinated acts of retaliation against Mr. Hope by the Classification Defendants, Polunsky Defendant Rehse, and co-conspirator Mr. McMullen, included:

- Improperly confiscating Mr. Hope's typewriter (which the confiscating officer did while taunting Mr. Hope that he would need to find a new way to type his grievances without it);

- Unnecessarily destroying contact information for several of Mr. Hope's outside advocates through whom he magnified his voice (and leaving no record of such confiscation on the property report);

5

⏱ Planting a screwdriver in Mr. Hope's cell and then dispatching officers to retrieve it, leading to a fabricated disciplinary charge for possession of a weapon and the foreseeable use of force via chemical agent against Mr. Hope to retrieve such "weapon";

⏱ Leaving Mr. Hope naked and covered in chemicals for days with no way to clean himself and with no clothing or blankets in February;

⏱ Instituting a "policy" of frequent cell moves where Mr. Hope was shuffled between cells more than 260 times in a six-year period and regularly exposed to unsanitary and toxic conditions; and

⏱ Repeatedly denying Mr. Hope's release from segregation back into G.P. without a penological or security purpose and without due process safeguards.

12.     After 2012, when Mr. Hope was repeatedly moved between cells for no apparent purpose, his new cells were often unsanitary and in various states of disrepair. Some of Mr. Hope's cells had leaks, broken lights, and unpredictable temperatures. Even more often, they had not been cleaned before Mr. Hope was housed in them, exposing Mr. Hope to mold, feces, urine, vomit, and other unsanitary filth, made worse by the lack of proper cleaning supplies made available to him.

13.     As Mr. Hope continuously challenged his mistreatment and pleaded for his release to G.P., Polunsky Defendant Rehse and various Classification Defendants made references to Mr. Hope's outside advocates, telling Mr. Hope it did not matter how hard he fought—he was staying in solitary confinement.

14.     This mistreatment continued even after Mr. Treon, the original official who had blocked Mr. Hope's release to G.P. in 2007, later made a personal call to the Director of

Classifications on Mr. Hope's behalf stating that Mr. Treon was not opposed to Mr. Hope's release. Shockingly, when Mr. Treon asked her if Mr. Hope would ever be allowed out of solitary confinement, the Director of Classification admitted out loud what was supposed to be kept under wraps: **"Oh no, he'll *never* get out of Seg."**[5]

15.    And the Classification Defendants may have been right, that they never would have let Mr. Hope out of segregation, except that they abruptly changed positions in an attempt to moot Mr. Hope's certiorari petition to the Supreme Court of the United States.  Only upon the filing of that petition was Mr. Hope finally, after nearly three decades, released from segregation to G.P. This ordeal did not leave Mr. Hope unscathed.  By plotting and executing a retaliatory scheme, by housing him in inhumane conditions, and by discarding him into an indefinite segregation, the Polunsky and Classification Defendants caused enormous and irreparable damage to Mr. Hope.

16.    Once out of solitary, Mr. Hope was sent to a transitional program at the Ellis Unit, where officials made clear upon his arrival that he would be singled out and watched more closely than other prisoners at the same unit.  During Mr. Hope's short time at this unit, the Ellis Defendants caused permanent damage to Mr. Hope's wrists by exerting excessive force when they intentionally applied and maintained overly tightened restraints to Mr. Hope while he was being treated at a hospital for respiratory distress in May 2022.

17.    In June 2022, Mr. Hope was transferred to G.P. at the John B. Connally Unit ("Connally"), where he is still housed today while fighting to rectify years of unconstitutional treatment at Defendants' hands.

---

[5] *The Box: 27 Years in Solitary Confinement*, Aʟ Jᴀᴢᴇᴇʀᴀ (June 27, 2023) at 13:32-14:48, https://www.aljazeera.com/program/fault-lines/2023/6/27/the-box-27-years-in-solitary-confinement ("The Box: 27 Years in Solitary Confinement").

## PARTIES

18.    Plaintiff Dennis Wayne Hope is an inmate incarcerated within TDCJ.  He is currently housed at the John B. Connally Unit, 899 FM 632, Kenedy, Texas 78119.  Mr. Hope's previous housing units included the James V. Allred Unit from approximately June 2001 to May 2007, the Polunsky Unit from approximately May 2007 to February 2022, and the Ellis Unit from approximately February 2022 to June 2022.  Mr. Hope's TDCJ identification number is 00579097.

19.    Polunsky Defendant Todd Harris[6] is now retired from TDCJ.  He was previously the Senior Warden at the Polunsky Unit, responsible for overseeing the conditions of confinement and treatment of prisoners in segregation.  Mr. Harris was aware that Mr. Hope was consistently shuffled from cell to cell and often confined in deplorable conditions but refused to remedy the conditions, disregarding the risk of serious harm.  These actions and omissions caused significant deprivations of basic human needs, in violation of the Eighth Amendment.

20.    Polunsky Defendant Chad Rehse is a Senior Warden at the T.L. Roach Unit, 15845 FM 164, Childress, Texas 79201.  He was previously a Captain and Major at the Polunsky Unit, responsible for overseeing the conditions of confinement and treatment of prisoners in segregation.  Mr. Rehse was aware that Mr. Hope was consistently shuffled from cell to cell (including at Mr. Rehse's authorization) and often confined in deplorable conditions but refused to remedy the conditions, disregarding the risk of serious harm.  Mr. Rehse retaliated against Mr. Hope for engaging in protected activity.  Mr. Rehse entered into a conspiracy with the Classification Defendants to retaliate against Mr. Hope and to deprive Mr. Hope of due process.

---

[6] Classification Defendants Harris, White, and Fiveash are retired from TDCJ so no employment address is available.  Mr. Hope has not included their personal addresses here to avoid making them public, but can provide them at the Court's request.  Defendants' counsel is believed to have their contact information.

These actions and omissions caused significant deprivations of basic human needs, in violation of the First, Eighth, and Fourteenth Amendments.

21.    Classification Defendant Leonard Echessa is the Administrative Review and Risk Management Division Deputy Director at the Brad Livingston Administrative Headquarters, 861 I-45, Unit B, Huntsville, Texas 77320.  Mr. Echessa was previously the Deputy Director of Support Operations and the Correctional Institutions Division ("CID")[7] Director, responsible for the overall treatment, conditions of confinement, and classification of prisoners within TDCJ.  He knew of, and did not rectify, the sham hearings underlying Mr. Hope's continued segregation and failed to provide any meaningful process for Mr. Hope to have his segregation reviewed for possible release to G.P.  Mr. Echessa entered into a conspiracy with the Classification Defendants and Polunsky Defendant Rehse to retaliate against Mr. Hope for engaging in protected activities and to deprive Mr. Hope of due process.  These actions and omissions violated Mr. Hope's First, Eighth, and Fourteenth Amendment rights.

22.    Classification Defendant Joni White is now retired from TDCJ.  She was previously the Director and Assistant Director of Classifications, and Chair and Vice-Chair of Classification and Records, with responsibility for implementing classification policies and supervising SCC classification decisions and review hearings.  Ms. White knew of, and did not rectify, the sham hearings underlying Mr. Hope's continued segregation and disclaimed authority to release Mr. Hope to G.P.  Ms. White retaliated against Mr. Hope for engaging in protected activity.  She entered into a conspiracy with the Classification Defendants and Polunsky Defendant Rehse to retaliate against Mr. Hope and to deprive Mr. Hope of due process.  These actions and omissions violated Mr. Hope's First, Eighth, and Fourteenth Amendment rights.

---

[7] CID oversees prisoner classifications.

9

23.     Classification Defendant Kelly Enloe is a member of the SCC at the Brad Livingston Administrative Headquarters, 861 I-45, Unit B, Huntsville, Texas 77320.  She was previously the Chair and Vice Chair of Classification and Records and Chair of the SCC, with responsibility for classification decisions.  She knew of, and did not rectify, the sham hearings underlying Mr. Hope's continued segregation and disclaimed authority to release Mr. Hope to G.P.  Ms. Enloe retaliated against Mr. Hope for engaging in protected activity.  Ms. Enloe entered into a conspiracy with the Classification Defendants and Polunsky Defendant Rehse to retaliate against Mr. Hope and to deprive Mr. Hope of due process.  These actions and omissions violated Mr. Hope's First, Eighth, and Fourteenth Amendment rights.

24.     Classification Defendant Melissa Bennett is the current Chair of the SCC at the Brad Livingston Administrative Headquarters, 861 I-45, Unit B, Huntsville, Texas 77320.  She was previously a member of the SCC, and she had responsibility for classification decisions.  She knew of, and did not rectify, the sham hearings underlying Mr. Hope's continued segregation and disclaimed authority to release Mr. Hope to G.P.  Ms. Bennett retaliated against Mr. Hope for engaging in protected activity.  Ms. Bennett entered into a conspiracy with the Classification Defendants and Polunsky Defendant Rehse to retaliate against Mr. Hope and to deprive Mr. Hope of due process.  These actions and omissions violated Mr. Hope's First, Eighth, and Fourteenth Amendment rights.

25.     Classification Defendant Bonnie Fiveash is now retired from TDCJ.  She was previously an SCC member with responsibility for classification decisions.  She knew of, and did not rectify, the sham hearings underlying Mr. Hope's continued segregation and disclaimed authority to release Mr. Hope to G.P.  Ms. Fiveash retaliated against Mr. Hope for engaging in protected activity.  She entered into a conspiracy with the Classification Defendants and Polunsky

10

Defendant Rehse to retaliate against Mr. Hope and to deprive Mr. Hope of due process. These actions and omissions violated Mr. Hope's First, Eighth, and Fourteenth Amendment rights.

26.    Ellis Defendant Simmons is, and was during the relevant time period, a Lieutenant at the Ellis Unit, 1697 FM 980, Huntsville, TX 77343. Ms. Simmons exerted excessive force when applying and maintaining restraints to Mr. Hope for a medical transport in May 2022, inflicting serious and lasting injuries on Mr. Hope in violation of the Eighth Amendment.

27.    Ellis Defendant Clark is, and was during the relevant time period, a Correctional Officer at the James "Jay" H. Byrd Unit, 21 FM 247, Huntsville, TX 77320. Mr. Clark exerted excessive force by maintaining improper restraints on Mr. Hope while he was being treated for a medical emergency in May 2022, inflicting serious and lasting injuries on Mr. Hope in violation of the Eighth Amendment.

## JURISDICTION & VENUE

28.    This is a civil rights action arising under 42 U.S.C. § 1983 and the First, Eighth, and Fourteenth Amendments to the United States Constitution. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343.

29.    Venue is proper in this Court and Division pursuant to 28 U.S.C. § 1391, because a substantial portion of the acts giving rise to the violations alleged herein occurred in this district and division.

## FACTUAL ALLEGATIONS

**I.    MR. HOPE WAS CONFINED TO SEGREGATION FOR 27 YEARS AFTER BEING DESIGNATED AN ESCAPE RISK IN 1995**

30.    Mr. Hope was initially placed in segregation in February 1995 when TDCJ officials placed an escape risk designation in his file following a 1994 escape from a TDCJ facility. Mr. Hope was 26 years old at the time.

31.    For the next 27 years, from 1995 until 2022, Mr. Hope was confined to a 9-foot by 6-foot cell.  After accounting for fixtures in the cell, Mr. Hope had a mere nine square feet of space in which to move around.  Initially, Mr. Hope was housed in the same cell for extended lengths of time, being moved to a new cell only on infrequent occasions.  By 2012, however, Mr. Hope began getting shuffled from cell to cell, often being moved multiple times a week.  Regardless of what cell he was placed in, each was approximately the size of a compact parking space, and he was always alone.

32.    Isolation defined Mr. Hope's daily life.  In fact, Mr. Hope was 53 years old when released from segregation to G.P., meaning he had spent over half of his lifetime (including nearly all of his adult life) in isolation, deprived of meaningful human contact, mental stimulus, physical activity, and human dignity.

33.    According to TDCJ policy, Mr. Hope could participate in only limited and isolated recreation outside of his cell, his only time outdoors.  He was allowed either one hour of recreation per day seven days per week, or two hours per day five days per week—that is, he was generally not allowed more than 10 hours per week outside of his cell for these 27 years.  Moreover, because of a number of factors, such as weather, unit-wide lockdowns, and staff shortages, Mr. Hope frequently went days, weeks, or even months without recreation (or sunlight).  During such periods, he spent 24 hours per day completely alone in his cell.

34.    Besides recreation, all of Mr. Hope's daily activities took place in his solitary cell. He ate every meal alone, from an often-dirty tray passed through a low, narrow slot in the cell door.  Even health checks were conducted in his cell, with his sanity and well-being assessed from the opposite side of his cell's steel door—and in earshot of the rest of the housing section.

Mr. Hope did everything—ate meals, read and wrote letters, prepared legal documents, and passed time—sitting on the cell's thin bed or floor or while standing.

35.    The only consistent physical human contact Mr. Hope experienced throughout these 27 years in solitary confinement was with prison guards as they strip searched his body, searched (or ransacked) his cell, or handcuffed him through the low door slot.  Mr. Hope was prohibited from contact visits, and from 1995 until approximately August 2020, was allowed only a single phone call, after his mother died.  Mr. Hope could not socialize with other prisoners or participate in religious or vocational activities.

36.    Mr. Hope's conditions of confinement in segregation differed notably from those in G.P.  In G.P., prisoners could socialize with others in the unit, eat in groups and at a table, work a job, make personal phone calls, watch television, and participate in prison programming. Mr. Hope was strip searched regularly in solitary, often four times per day; in contrast, he would have experienced pat downs in G.P.  G.P. also experienced fewer lockdowns, which meant fewer "johnnie's," the bagged meals provided instead of cooked meals during such periods.

37.    Being kept in segregation restricted Mr. Hope's access to property and legal materials.  Prisoners in segregation are allowed to possess far less property—including reading material, clothing, pictures, and other personal items—than their G.P. counterparts.  And while those in G.P. are allowed to research in the law library and to check out entire books, Mr. Hope was only permitted to request legal materials three cases at a time and only three times per week (or less, depending on holiday and staffing schedules).  These restrictions impaired his access to the courts, including in advance of filing his *pro se* complaint in this case.

13

## II.    THE PROCESS USED TO REVIEW MR. HOPE'S SEGREGATION WAS REPEATEDLY INTERFERED WITH, RENDERING IT MEANINGLESS

38.    As detailed below, Mr. Hope was entitled to have his placement in solitary confinement reviewed by the SCC.  After the Security Precautions Designator Review Committee ("SPDRC") found Mr. Hope was no longer an escape risk, the SCC decided at an April 2007 review hearing to return Mr. Hope to G.P.  This decision made sense, as the SCC reviews the same prisoner file that the SPDRC reviews.  Yet the SCC's decision was inexplicably overruled— reportedly by Mr. Treon in "administration,"—and then all record of the April review mysteriously disappeared from Mr. Hope's file when he appeared before SCC member Jones, who agreed to defer to Mr. Treon.  A similar pattern repeated in 2010 when the SCC again decided to release Mr. Hope to G.P., but again the decision was reversed outside of the proper appeals process—and again due to interference from then SCC Chair Jones.

### A.    Mr. Hope Was Entitled To Meaningful Reviews Of His Segregation Placement

39.    Mr. Hope, like all TDCJ prisoners in solitary confinement, was entitled to a review hearing before the SCC every 180 days (i.e., every six months) to have his placement in segregation reviewed for potential release into G.P.

40.    SCC review hearings are conducted by (1) a representative of the SCC, (2) the warden or designee, and (3) other staff (e.g., medical or building staff) as deemed appropriate. Upon information and belief, although the warden and other staff are present, the SCC representative has final decision-making authority at an SCC review hearing.

41.    Prior to a review hearing, a prisoner has the right to receive notice of the hearing, including of any specified reasons for their continued placement in solitary.  Prisoners have the right to attend the review hearing (unless they pose a threat to security), to give their own statement, and to submit written witness statements and other documentary evidence.

14

42.     Such evidence is supposed to form the basis for the SCC's decision about whether continued solitary placement is justified, along with considerations regarding whether the prisoner being reviewed "would *still be*: [a] *current* escape risk; [a] physical threat to staff or other offenders; [or a] threat to the order and security of the prison as evidenced by repeated, serious disciplinary violations."[8]  In that assessment, the SCC must evaluate a variety of factors related to the prisoner's time in segregation, including disciplinary violations (and their severity and frequency), medical evaluations, relationships with other prisoners and staff, participation in programs, and the prisoner's desire to remain in or stated readiness to leave segregation.

43.     The SCC "makes final decisions regarding administrative segregation."[9]  And after a review hearing, the SCC is to provide the prisoner with "a written decision stating the reasons for the decisions and summarizing the information presented and considered."[10]  Prisoners have the right to appeal the SCC's final decisions through the grievance process.  A warden may also challenge a SCC decision by appealing to the Departmental Review Board, which hears the appeal and issues a decision.[11]

**B.     In 2005, TDCJ Removed Mr. Hope's Escape Risk Designation**

44.     From 1995, when Mr. Hope was first placed in solitary, until 2005, the SCC based its decision to keep Mr. Hope in segregation on his "escape risk" designator.  However, in 2005,

---

[8] TDCJ Administrative Segregation Plan (March 2012) at 17, 30 (emphasis added), available at https://tifa.org/wp-content/uploads/2014/02/Administrative-Segregation-Death-Row-Plan-1.pdf (the "Ad. Seg. Plan").  The 2012 plan superseded the 2005 plan, which, upon information and belief, outlined the same substantive criteria to be considered at SCC review hearings (emphasis added).

[9]   TDCJ   Offender   Orientation   Handbook   at   7   (Feb.   2017),   available   at https://www.tdcj.texas.gov/documents/Offender_Orientation_Handbook_English.pdf

[10] Ad. Seg. Plan at 17.

[11] Ad. Seg. Plan at 31.

the SPDRC removed this designator from Mr. Hope's file, indicating that the escape—more than a decade earlier—could no longer justify keeping him in solitary. Its removal reflected a judgment that, after 10 years in solitary without any escape attempt, neither Mr. Hope's behavior nor other circumstances indicated that Mr. Hope still posed an escape risk. Because this designator was the reason Mr. Hope was placed in segregation, and because there was no evidence that Mr. Hope presented a physical threat or of repeated serious disciplinary violations, its removal sent a significant message: TDCJ no longer had a valid security interest in keeping Mr. Hope from being released to G.P.

### C.    In 2007, The SCC Decided Mr. Hope "Shall" Be Released From Solitary, But That Decision Was Reversed Without Explanation

45.    On or around April 4, 2007, with no escape risk designator in his file, and 12 years since his placement in solitary, the SCC decided to release Mr. Hope to G.P. SCC member Steven Rogers communicated this decision to Mr. Hope at the review hearing and recorded it on the SCC Review Hearing Record, checking the box for "The offender shall [] [b]e released to General Population." Under the section for "the basis for Committee decision," Mr. Rogers checked the box for "Other"—all other options provide reasons to hold someone in solitary, with no prefilled options providing bases for release—and wrote in that it had been 12 years since his escape, he no longer had an escape risk designator, and Mr. Hope displayed a "good attitude."

46.    Despite what was decided at the SCC review hearing and recorded on the form, Mr. Hope was not released from segregation to G.P. in 2007 and instead was transferred to segregation at the Polunsky Unit. Upon information and belief, this change was made based on instructions from Regional Director Robert Treon, who had been the warden of the unit from which Mr. Hope had escaped years earlier, and who now had oversight of the Polunsky Unit—where Mr.

Hope would be housed with those on death row.[12]  Mr. Treon has since explained in a 2023 interview with the media that for years he was embarrassed by Mr. Hope's escape.[13]

47.    When Mr. Hope grieved this unexpected change, Polunsky Assistant Warden Billy Hirsch told Mr. Hope: "You were transferred by State Classification to the Polunsky Unit with instructions that you remain in security detention.  You will remain in Administrative Segregation until State Classification changes your status."  However, when Mr. Hope followed up with Major Nelson, who was responsible for cell assignments in Polunsky's segregation unit, Ms. Nelson responded that she had not received a copy of the April 4, 2007 SCC Review Hearing Record, but that she was told by Mr. Rogers that his decision to release Mr. Hope to G.P. was "overturned by the Administration," and consequently, Mr. Hope would remain in solitary confinement.

### D.    Mr. Hope Expressed His Concerns To The SCC And TDCJ Officials

48.    Following the administration's surprise reversal, Mr. Hope repeatedly contacted Mr. Rogers, other SCC members, and TDCJ officials asking why the SCC's decision was not upheld and what he must do in order to be released from solitary to G.P.  Mr. Hope had his outside advocates also contact Mr. Rogers, including in or about January 2008.

49.    Resulting from this letter campaign, SCC member Rogers communicated to one of Mr. Hope's advocates that Mr. Treon would never allow Mr. Hope to be released from solitary to G.P., so Mr. Hope would need to wait until Mr. Treon left TDCJ.  Despite the SPDRC finding that Mr. Hope posed no escape risk, Mr. Treon had reportedly convinced Mr. Rogers that Mr. Rogers would be held responsible if Mr. Hope were released to G.P. only to escape again.  Mr. Hope also

---

[12] A warden may challenge an SCC decision by adhering to a defined process.  *See* Ad. Seg. Plan at 31.  Upon information and belief, in the instances when the SCC's decision to release Mr. Hope to G.P. were overturned, no such challenges or appeals had occurred.

[13] The Box: 27 Years in Solitary Confinement, at 6:34.

expressed his concerns directly to Mr. Treon, including in letters sent in or about June 2007 and January 2008.

**E.    The SCC "Lost" Its Copy Of The 2007 Decision Approving Mr. Hope's Release To General Population**

50.    Then-SCC member Vanessa Jones conducted Mr. Hope's next SCC review hearing only three months later, on or about July 13, 2007, instead of at the regular 6-month interval. Mr. Hope asked Ms. Jones why he was being reviewed again so soon, and he showed her his copy of the April 4, 2007 Review Hearing Record for his release to G.P.  She acted surprised to see he had been reviewed recently.  Ms. Jones claimed his file had no record of the April review or release decision and asked Mr. Hope for his copy.  Mr. Hope offered to let her photocopy it in his presence but declined to give up his only copy of the paperwork.  Mr. Rogers later admitted to Mr. Hope and his advocate that Mr. Rogers had torn up the SCC's copy of his release form based on Mr. Treon's instruction not to leave a paper trail.

51.    Upon information and belief, Ms. Jones's attempt to take Mr. Hope's copy of his April form was intended to serve the same purpose.  Ms. Jones had a close relationship with Mr. Treon; she had come up through TDCJ under Mr. Treon and had worked closely with him as his Unit Classification Chief when Mr. Treon was Warden at the now-Polunsky Unit.   And Ms. Jones's agreement to uphold Mr. Treon's wishes was further reinforced when she told Mr. Hope at the July 2007 review hearing that she would not release him to G.P. without first giving Mr. Treon the option to speak with Mr. Hope and approve the decision.

52.    Like Mr. Rogers, other SCC members at subsequent review hearings echoed this fear of repercussions if they were to release Mr. Hope to G.P.  For example, SCC member Maryann Comstock expressed a willingness to release Mr. Hope to G.P. but for a note in his file indicating SCC members should consult Mr. Treon before releasing Mr. Hope.

**F.    Administrators Dangled A Release From Solitary—If Mr. Hope Behaved With The Media**

53.    Mr. Hope spoke with Mr. Treon in or around October 2009.  At the time, Mr. Hope had recently been interviewed for a documentary program "Breakout" on "Raw TV" about his time in solitary.  The film was set to air on the National Geographic channel for the first time in the coming days.  Mr. Treon said he would release Mr. Hope from solitary to G.P. after the film's release if Mr. Hope had not said anything that "sounded crazy" during his interview.  However, Mr. Treon did not speak to Mr. Hope again prior to Mr. Treon's retirement from TDCJ.

**G.    In 2010, The SCC Again Decided Mr. Hope "Shall" Be Released To General Population—Yet Again Mr. Hope Was Left In Solitary Indefinitely**

54.    In January of 2010, after Mr. Treon retired, Mr. Rogers again decided at an SCC review hearing to release Mr. Hope from solitary to G.P, and again noted his decision on the SCC Review Hearing Record.  Two correctional officers confirmed to Mr. Hope that they understood he was being released to G.P.  Yet, again, the SCC's decision was changed without explanation or opportunity for meaningful appeal when Vanessa Jones, then SCC Chair, intervened.

55.    On or around February 23, 2010, a sergeant informed Mr. Hope that he would not be released to G.P., notwithstanding the SCC's January decision.  Mr. Hope filed a grievance asking for an explanation.  In April, Mr. Hope received a response to his grievance stating that the SCC Chair—Ms. Jones—had reversed the SCC's January decision to release him from solitary to G.P.

56.    Upon information and belief, prior to Mr. Hope's next review hearing, Ms. Jones contacted several SCC members and mandated they keep Mr. Hope in segregation.  For example, in or around July 2010, at his next SCC review hearing, SCC member Lovelady explained that she had spoken to Ms. Jones who had instructed her to keep Mr. Hope in solitary.

57.     In August 2010, Ms. Jones responded to a letter Mr. Hope had sent her in or around March 2010 regarding her reversal of the SCC's January 2010 release decision.  Ms. Jones attempted to justify overturning the decision, writing to Mr. Hope that although his escape risk designation had been removed because of the length of time that had elapsed without incident, his case was still considered "unusual and difficult," and she would not implement SCC review hearing decisions for his release without additional approval by the Chair or Vice-Chair of Classification and Records.  Mr. Hope was not given an explanation for how or why this undocumented characterization was applied to his case or what must be done to have it removed, or whether the Chair or Vice-Chair of Classification and Records had even been asked to approve the SCC's January release decision.  Neither was he allowed to challenge the application of this characterization to his case.  Mr. Hope again sent letters to the SCC, including to Ms. Jones and the Chair of Classification and Records.

## III.     THE CLASSIFICATION DEFENDANTS ENTERED A CONSPIRACY TO RETALIATE AGAINST MR. HOPE

58.     By 2011, the SCC had twice decided to release Mr. Hope from solitary to G.P.— and twice those decisions were reversed after the fact without explanation.  As explained further below, Mr. Hope was outspoken in challenging these reversals and other issues he had with his review process, and his and his advocates' communications were met with resistance.  What had started out as interference from Mr. Treon, and then progressed to Ms. Jones ceding authority to Mr. Treon, now became an agreement to retaliate against Mr. Hope for his protected activities.  Now as SCC Chair, Ms. Jones spent most of her time in Huntsville at administrative headquarters, where the Classification Defendants were also based at overlapping times.  From behind closed doors, Ms. Jones and the Classification Defendants emerged with a single, unified response:  Mr. Hope was to remain in solitary indefinitely—or at least until the group changed its mind.

59.     This agreement began a years-long pattern in which various members of the SCC vacillated at review hearings between sometimes disclaiming any authority whatsoever to release Mr. Hope to G.P., and other times assuring him he would be released to G.P., only for that decision to be inexplicably reversed with no meaningful opportunity to appeal.  Regardless of the position they took, the result was the same: Mr. Hope was left in segregation indefinitely with no guidance on what he could do to be released back to G.P. or who had the authority to make such a decision.

60.     Going forward after his 2010 review hearings, Mr. Hope prepared written statements that he brought to and submitted at each of his subsequent SCC review hearings, in addition to continuing to send letters to the SCC and classification officials.  Oftentimes, however, the single SCC member who attended the review hearing failed to even read the letter.  Instead, at most of Mr. Hope's review hearings, an SCC member would begin by announcing that he would remain in solitary confinement.  Only then would the SCC member ask Mr. Hope if he wanted to make a statement.  Mr. Hope's review hearing in or about January 2014 before Classification Defendant Fiveash provides an example.  Mr. Hope submitted a written statement but, Ms. Fiveash did not consider it and marked the box that he had submitted nothing for consideration.  As a result of these predetermined results, Mr. Hope spent another 12 years in solitary confinement, without any meaningful process by which to have his status reviewed.

61.     At several review hearings, SCC members disclaimed any ability to review or release Mr. Hope from segregation.  For example, at one such review hearing on or around June 11, 2015, SCC member Armstrong told Mr. Hope, in sum or substance, simply that "there's nothing I can do for you."  SCC member Sheila Leblanc told Mr. Hope she had no problem with him being in G.P. but did not want responsibility for the decision herself.

62.     Other SCC members claimed someone else had authority over whether to release Mr. Hope to G.P., despite those other officials never being present at the review hearings.  For example, SCC member Bilnoski told Mr. Hope he would have released Mr. Hope, but an unidentified administrative committee had just reviewed Mr. Hope, and Mr. Bilnoski could not overrule their determination.

63.     On a rare occasion when Mr. Hope appeared at a review hearing before someone willing to actually review him, such as in or around June 2014 before SCC member Buckner, Ms. Buckner decided to release Mr. Hope to G.P., but then mysteriously changed her mind a week after returning to Huntsville.

64.     Mr. Hope received different treatment than other prisoners in solitary, including some who also had previous escapes.  In fact, one of the two prisoners who had escaped with Mr. Hope in 1994 was released to G.P. in approximately 2004 (just before Mr. Hope's escape risk designator was removed), and the second was released several years later—facts Mr. Hope pointed out to the SCC and Classification Defendants in his letters.  SCC members Bilnoski and Rogers once had Mr. Hope brought to them outside the confines of an official review hearing, further indicating that Mr. Hope was being discussed outside the regular review process.

A.     **The Grievance Process Provided No Meaningful Opportunity For Appeal**

65.     Unable to get answers from the SCC and unsure what more he could do to be released to G.P., or to ensure he was at least reviewed by someone with the authority to make release decisions, Mr. Hope continued to pursue any options available to him.  One such avenue was through the grievance process.  A prisoner can appeal an SCC review hearing decision by filing a grievance.  Mr. Hope did so, including in or around July 2011 and multiple subsequent times in the years since.  He filed grievances related to SCC review hearings conducted by

Classification Defendants Bennett, Enloe, and Fiveash, where Mr. Hope challenged the review hearing process and explained the SCC's apparent lack of authority.

66.    The problem, however, was that the filed grievances were responded to by unit officials, not by SCC members or classification officials with authority over the SCC process.  In one representative response to such grievances, a warden told Mr. Hope that his release was "at the discretion of the State Classification office" and that Mr. Hope would "need to discuss the issue during [his] next State classification hearing."  Mr. Hope received similar responses from the TDCJ Office of the Independent Ombudsman, including in or around November 2015.

67.    In practical terms, this pattern meant that Mr. Hope's "appeals" never reached anyone with authority to review or change the outcome.  Unit officials insisted that only the SCC had the ability to release Mr. Hope to G.P., but SCC official after SCC official insisted they did not have the necessary authority.  Thus, no actual process for release was available to Mr. Hope.

**B.    The Classification Defendants Grew Angry With Mr. Hope's Outreach**

68.    Another avenue Mr. Hope pursued was through his letters, which he and his advocates sent increasingly often and to increasingly higher-ranking officials—even to people outside of TDCJ who Mr. Hope thought might be able to help.

69.    In 2011, for example, Mr. Hope sent letters to the SCC, SCC member Jones, and TDCJ Deputy Director Thomas Prasifka, among others.  In these and other letters, Mr. Hope expressed his concerns with his SCC review hearings and the lack of clarity regarding who had the authority to release him to G.P., disclosed how solitary was causing or contributing to medical issues with his heart, cholesterol, and back, and explained how being denied release to G.P. meant he would not be paroled despite otherwise being eligible.

70.    His letter writing campaign continued in subsequent years as well, with additional communications directed to both specific SCC members and to the SCC generally, and to

Classification Defendants White, Enloe, and Echessa, and others with roles in or oversight of classifications and the review process. Mr. Hope also wrote to officials outside the prison system, including multiple letters to then-Texas Senator John Whitmire, hoping the Senator could investigate or speak to someone at TDCJ on his behalf.

71.     Outside advocates—often at Mr. Hope's request or with his permission, although occasionally on their own and without his knowledge—did the same through letters and phone calls. These communications were on matters of significant public concern—the treatment of those in our criminal justice system and the operation of Texas prisons generally—as well as Mr. Hope's treatment specifically. Advocates wrote letters to Classification Defendants White, Enloe, and Echessa, and others both at TDCJ and outside of the system, and made calls and spoke with officials, including Classification Defendants White and Echessa. As email became an increasingly preferred form of communication, Mr. Hope drafted messages on his typewriter or by hand, which he then mailed to his advocates to send as emails to officials on his behalf. When possible, Mr. Hope's advocates spoke with officials in person, either at Polunsky or at TDCJ meetings open to the public.

72.     Mr. Hope had followed protocol, was typically at the highest level of privileges within segregation due to good behavior and minimal disciplinary infractions, and completed every educational program available to him, but the SCC seemed determined to hold him to a shifting standard, without explaining what that standard entailed. Mr. Hope did not know what else he was required to do to be released to G.P., and he could not find anyone willing to provide an answer.

73.     SCC and classification officials often took more than a month to respond to Mr. Hope's letters and those of his advocates—if they bothered to respond at all. At times, Mr. Hope had to send repetitive letters to the same person following up on a single question in order

to receive a response.  Other times, he and his advocates received only generic responses to their outreach and had to send additional messages repeating their questions that the official had failed to answer in their stock response.  Still other times, Mr. Hope and his advocates resorted to contacting the TDCJ Ombudsman's Office pleading for help because too many of their calls and messages to the SCC and classification had gone unanswered (although this proved futile as the Ombudsman's Office would only refer them to the SCC for classification-related questions).

74.     When Classification Defendants did respond, they often made clear that they found Mr. Hope's outreach to be bothersome and discouraged him and his advocates from continuing to contact them.  For example, in response to one advocate who reached out to Classification Defendant White at Mr. Hope's request regarding SCC members disclaiming authority to make release decisions, Ms. White expressed that it was unnecessary for anyone to contact her again.  Similarly, at an SCC review hearing where Classification Defendant Enloe claimed to have been sent by Ms. White, Ms. Enloe told Mr. Hope that his and his advocates' outreach efforts would not get him out of segregation.

### C.     Mr. Hope Upset Officers By Questioning Improper Disciplinary Cases

75.     In or around October 2011, the recently promoted then-Major Virgil McMullen suddenly banned razor blades in Mr. Hope's building.  Loose razor blades had long been allowed for their multiple legitimate uses, such as shaving, cutting food, sharpening pencils, and trimming toenails.  Under the secret new rule (which applied only to Mr. Hope's building), possession of loose razor blades was suddenly prohibited.  Upon information and belief, Mr. McMullen designed the change, at least in part, to issue possession of weapon disciplinary cases to prisoners in solitary, making them appear more dangerous and making it harder for them to be released to G.P.

76.     Unsurprisingly, when Mr. McMullen instructed Officer Tatum to search Mr. Hope's cell in or about mid-October 2011 (just a week after Mr. Hope's advocates' most recent

letter to Deputy Director Prasifka), Mr. Tatum found five loose razor blades—each previously issued to Mr. Hope by officers and in his possession for some time.  Because Mr. McMullen instructed Mr. Tatum to issue possession of weapon cases rather than lesser, possession of contraband cases, Mr. Hope received a serious charge, despite not having demonstrated an intent to use the loose razors as weapons (as is required for a possession of weapon charge).

77.    On or about October 28, 2011, an unusually brief few days after the incident, Captain Virgil Miller heard Mr. Hope's disciplinary case and entered a finding for possession of a weapon.  The offense impacted Mr. Hope's privileges level in solitary and his parole eligibility.

78.    Mr. Hope filed a grievance about this excessive charge (which was denied at Step 1 and Step 2 reviews) and wrote a letter to Polunsky's warden.  Because of his letter, the Warden scheduled a meeting among himself, Mr. Hope, Mr. McMullen, and Mr. Miller.  At the meeting, Mr. Miller admitted he had found Mr. Hope guilty of possession of a weapon because Mr. McMullen had instructed him to do so.  The Warden agreed Mr. McMullen had overstepped but said there was nothing he could do because Mr. Hope's grievance had already been denied.

79.    Years later, Mr. Hope discovered another avenue for challenging this charge.  Still concerned about the severe implications of a guilty finding of "possession of weapon" on his record, Mr. Hope wrote to Regional Director of Discipline Amy Oliver.  In or around September 2015, Ms. Oliver ultimately agreed to reduce the charge to possession of contraband, as the incident did not meet the definition of possession of a weapon.  As a lesser offense, possession of contraband could not be used as a justification to keep Mr. Hope (or anyone) in solitary.

## IV.    THE CLASSIFICATION DEFENDANTS EXPANDED THEIR AGREEMENT TO SEGREGATE MR. HOPE INDEFINITELY, AND TRIED TO SHIELD THEMSELVES FROM SCRUTINY

80.    Mr. Hope had communicated extensively—using all means available to him from his solitary cell as well as working through outside advocates with greater abilities to amplify his

voice—and the message to the Classification Defendants was clear: Mr. Hope was, and would continue, challenging his indefinite segregation, bringing awareness to flaws in his review process and seeking an explanation as to how he could be kept in solitary for years on end with no escape risk designator and with largely clean disciplinary records. Mr. Hope and his advocates were unsatisfied with the stock responses being given to them and demanded more. This challenge meant that Mr. McMullen's sensationalized possession of weapons case came at the perfect time for the Classification Defendants' needs: it provided a concrete example to which they could point as a justification for why Mr. Hope remained in segregation. Indeed, SCC members brought up this "major" disciplinary offense at future SCC review hearings as an excuse to deny Mr. Hope's release to G.P., and the incident was cited by the Classification Defendants in responses to Mr. Hope's advocates as the purported justification for keeping Mr. Hope in segregation.

81.     Still, even a possession of weapons case could not justify keeping Mr. Hope in solitary forever. The Classification Defendants needed yet another, more egregious, pretext to keep Mr. Hope in solitary and to immunize themselves from the scrutiny caused by Mr. Hope's continuously contacting TDCJ officials who outranked them, state legislators, and media members. Mr. McMullen would again provide that cover just two months later.

**A.     Major McMullen Provided The Classification Defendants With Another Excuse To Keep Mr. Hope In Segregation**

82.     By 2012, word had spread that Mr. McMullen did not like Mr. Hope. For example, after the meeting with the warden and Mr. McMullen about the loose razors, Mr. Hope heard from an officer assigned to his housing area that Mr. McMullen was "not happy" that Mr. Hope had challenged his authority and written grievances about Mr. McMullen's policies. Similarly, Mr. Hope was told by a different officer that Mr. McMullen "hated" Mr. Hope because of how

Mr. Hope had spoken to and about Mr. McMullen in front of the Warden about the improper charge.

83.     In or about January 2012, Mr. Hope had an SCC review hearing where Major McMullen and then-Lieutenant Paul Tolly participated.    Upon information and belief, Mr. McMullen's anger at Mr. Hope and involvement in his recent trumped-up disciplinary case contributed to Mr. McMullen being selected to join this review hearing panel.    Having Mr. McMullen on the SCC panel meant that Mr. McMullen and the SCC members were able to speak privately, including in the moments leading up to and after Mr. Hope's hearing when their attention was focused on keeping Mr. Hope in solitary.

84.     The extent of Mr. McMullen's and the SCC's conversations about Mr. Hope that day was soon revealed.    Several days after the review hearing, Mr. McMullen remarked to Mr. Hope as he passed his cell that, in sum or substance, "You can have anyone you want call *us*, but it's not going to help.    You're staying in Seg."    At that time, Mr. Hope's advocates had spoken with SCC and classification officials about the sensationalized charge for the loose razors, but no one outside of Mr. Hope had contacted Mr. McMullen.    Instead, this foreboding comment indicated that Mr. McMullen had partnered with the conspirators so that they now viewed themselves as an "*us*" against Mr. Hope.    To make sure that threat came true, Mr. McMullen and the Classification Defendant conspirators orchestrated a grievous campaign of retaliation against Mr. Hope, put into action the following month.

   **B.     In February 2012, The Conspirators Directed An Improper Confiscation Of Mr. Hope's Property And Planted A Screwdriver In His Cell**

85.     Within a few weeks of Mr. McMullen's ominous threat that he had partnered with the conspirators (to form an "*us*") to keep Mr. Hope in segregation, Mr. Hope's cell was searched and the typewriter he used to write grievances and letters to classification officials was confiscated.

86.    In or around February 2012, at Mr. McMullen's instruction, Officer Helen Sheffield, Officer Burke, and several others arrived to search Mr. Hope's cell and sent him to wait at the shower.  After about an hour, Mr. Hope peered through the slit in the shower door and saw his typewriter in the hallway.  Panicked, he yelled over to ask why.  Ms. Sheffield responded, in sum or substance, "I guess you'll have to find a different way to file grievances."  Following through with her threat, Ms. Sheffield took the typewriter.  Although she wrote in the confiscation report that the typewriter's wiring appeared altered, Mr. Hope had not altered the typewriter in any way since purchasing it directly from Polunsky's commissary—and it was in the same condition as it had been only days earlier when a different searching officer found no problem with it.

87.    Although Mr. Hope later grieved the improper confiscation, his grievance was denied and his typewriter was never returned.  This confiscation hindered Mr. Hope's ability to file grievances (which the TDCJ Offender Handbook instructed should be "type[d] if possible"[14]), send letters to the officials, and communicate with those advocating on his behalf.  Ultimately, Mr. Hope had to spend $225 to buy a new typewriter from commissary and live with the fear that his new one too could be confiscated at any time.

88.    When Mr. Hope was returned to his cell after Officer Sheffield's confiscations, he discovered that his personal belongings, including legal communications and grievance paperwork, had been strewn about and a pen smeared with peanut butter stuck on his papers, destroying all previous efforts he had made to organize his files.  Mr. Hope discovered that several pages of his ledger, which contained contact information for the outside advocates working with him to challenge his indefinite solitary confinement, were missing.  These pages were not listed

---

[14] TDCJ Offender Handbook (2004) at 53; *see also* TDCJ Offender Handbook (2017) at 74.

on Ms. Sheffield's confiscation report, although as Mr. Hope continued inquiring in the following weeks, Officer Sheffield eventually admitted in writing that she had taken the pages.

89.    As Mr. Hope continued cleaning up the mess, he noticed the officers had left behind a red bag under his toilet. He picked it up, unrolled it, and discovered a 10-inch screwdriver.

### C.    Minutes Later, The Conspirators Sent Officers After The Planted "Weapon" And Repeatedly Deployed A Chemical Agent

90.    It is unusual to have two cell searches within days of each other; it is *extremely* unusual to have two cell searches within the same hour. Yet, that is what happened on this day in February 2012. It had never happened to Mr. Hope before, and it has never happened since.

91.    Approximately 15 minutes after he found the screwdriver, a second group of officers—including then-Lieutenant Tolly, who had been at the January SCC review hearing with Mr. McMullen—came to search Mr. Hope's cell,[15] before Mr. Hope even had a chance to decide who he could safely contact about returning the screwdriver.

92.    Now wary that the screwdriver had been purposefully planted,[16] Mr. Hope asked the officers to return with a camera. He feared the officers would claim the screwdriver was an escape tool and the SCC would use it as an excuse to keep him in solitary for years longer, so

---

[15] The group also included Officers Burke, Charles Mann, Runyon, Amanda Maddox, and Aaron Baker, now a captain, along with then-Sergeant and now Warden Terry Andrews.

[16] Mr. Hope's concerns proved to be well founded. Six years after the screwdriver was planted in Mr. Hope's cell, Major McMullen and others were the subject of an OIG investigation and a lawsuit for, among other misconduct, planting screwdrivers in a prisoner's cell as retaliation for filing grievances; as a result, multiple officers were indicted, terminated, resigned, or demoted and transferred. *See* Keri Blakinger, *4 Texas Prison Officials Indicted after Alleged Screwdriver-Planting Incident at Brazoria Lockup*, HOUSTON CHRONICLE (July 11, 2018), https://www.chron.com/news/houston-texas/article/4-Texas-prison-officials-indicted-after-alleged-13064474.php ("The Office of the Inspector General launched an investigation and found the claim had merit."); *Giese v. Jackson*, No. 3:19-CV-00081, 2020 WL 3493078, at *4 (S.D. Tex. May 27, 2020) (finding that "the summary judgment record contains evidence that McMullen [was] aware of [a prisoner's] grievances" and "act[ed] against him" by "plant[ing] screwdriver's in [the prisoner's] cell").

Mr. Hope wanted a recording of him peacefully and willingly returning the screwdriver and reflecting that it was TDCJ's screwdriver to ensure officers could not switch it out later for a prison-made screwdriver to discredit him.  The officers refused.  Mr. Hope nudged the screwdriver through the mesh screen of his cell.  He believed the officers would agree to get the video camera if he showed them he had their screwdriver and wanted to return it.  When they still refused, Mr. Hope withdrew the screwdriver in a final effort to have the officers bring a video camera to his cell.

93.     This effort was successful but not in the way Mr. Hope had expected.  Officers returned with a video camera, as policy required when there was a risk of use of force, and with Mr. McMullen.  Instead of allowing Mr. Hope to return the item on camera, officers entered his cell with immediate force.  Sergeant Andrews sprayed a chemical agent directly into Mr. Hope's face and body, triggering at least five bursts from the canister.  Mr. Hope was instantly enveloped in a painful burning sensation and fell to the floor.  The officers then forced Mr. Hope to strip naked, handcuffed him, and moved him to a different cell, where the officers disabled the sink's running water.  Mr. Hope was left naked and alone, covered with the chemical residue for days.  On the fourth day, he received only a pair of underwear but still had no way to clean the chemicals off his body without water (let alone soap).  Only on the eighth day was Mr. Hope given his clothing and property back and allowed to shower, despite standard policy that prisoners be offered the chance to shower daily.  In a later conversation with Sergeant Andrews, Mr. Hope learned that Mr. McMullen had mandated that Mr. Hope not be allowed to wash off the chemicals.

94.     It was February, and he was left with no clothing or blankets,[17] though Mr. Hope's skin burned with artificial warmth from the chemicals.  Chemical residue coated every surface of

_____

[17] In fact, blankets were withheld from Mr. Hope for almost a full month, despite the winter chill.

his property, which he had no way to clean, so every possession he touched, every paper he tried to read or letter he tried to write, caused him physical pain for weeks.  And for weeks Mr. Hope had trouble tasting food because all he could taste was the chemical spray.  This was a life-altering incident for Mr. Hope, and his nightmares, anxiety, and depression from this extreme and inhumane series of acts continue to this day.

95.    Around this time, Mr. McMullen and Mr. Tolly again came by Mr. Hope's cell to convey, in sum or in substance, that Mr. Hope was going to learn not to speak out about his treatment or conditions.

96.    Despite the controversy over whether the screwdriver had been planted in Mr. Hope's cell, the SCC jumped at the chance to cite the possession of weapon charge for the screwdriver as the reason to prolong his segregation.  This fabricated story was first cited at his review hearing in or around July 2012 before SCC member Lovelady.  It was next brought up in or around January 2013 when Mr. McMullen again joined SCC member Bilnoski for his review hearing.  Mr. McMullen affirmatively brought up the incident, claiming Mr. Hope had overreacted.  Mr. Bilnoski denied Mr. Hope's release to G.P. because, in sum or substance, that incident "didn't help [his] cause."

## V.    MR. HOPE CONTINUED TO CHALLENGE HIS MISTREATMENT AS DEFENDANTS TRIED TO SILENCE HIM

### A.    Mr. Hope Continued Speaking Out Against His Mistreatment

97.    Fearful of further retaliation, but with limited options, Mr. Hope filed a grievance in or about early March 2012, despite still experiencing burning sensations on his fingers.  In the grievance, he challenged two of the three major disciplinary cases he received arising from the planted screwdriver: assault of an officer and possession of a weapon.  This time he wrote his

grievance by hand, reminding him of Officer Sheffield's taunt when she took his typewriter that he would need to "find a different way to file grievances."

98.    In addition to grievances, Mr. Hope continued his widespread outreach efforts, speaking out about his mistreatment during those February incidents and seeking help from anyone seemingly in a position to provide it.  Mr. Hope and his advocates contacted, among others, Classification Defendants White and Enloe, then-Texas Senator Whitmire, and a Senior Correspondent at MSNBC.

99.    Ultimately, Mr. Hope's charges were reduced despite his grievance being denied. Instead of being charged with stabbing an officer, which *never* occurred, the charge was reduced to attempt (which also never occurred).  And the possession of a weapon charge for the planted screwdriver was dropped altogether after an investigation concluded the screwdriver belonged to Ms. Sheffield's search team.  Notably, Mr. Hope did not challenge the refusal-to-follow-instruction charge because he acknowledged that he had refused to follow an instruction while waiting for the officers to bring the video camera.  Instead, he had challenged only those charges in which he was accused of doing something he had not done.

## B.    The Conspirators Implemented Constant Cell Moves That Unsettled Mr. Hope And Exposed Him To Inhumane Conditions

100.    As Mr. Hope's efforts continued, so did the Classification Defendants' and those of their co-conspirator, Mr. McMullen—this time instituting an unofficial "cell-move policy" against Mr. Hope.  Previously, Mr. Hope was moved infrequently and spent lengthy periods of time in the same cell throughout his first 17 years in solitary.  In contrast, after 2012, Mr. Hope was moved on a near-constant basis—approximately 260 times between 2012 and 2018.  This rate of moves lacked penological or security purpose and exacted a grave toll on Mr. Hope.

101.    At first after the manufactured February incidents, Mr. Hope was on a heightened security level, limiting the number of cells available in which he could be placed. As time passed, Mr. McMullen and Mr. Tolly were the first to review Mr. Hope's housing assignment. They completed a form to keep him at a more restrictive (and less desirable) level. However, a secretary saw the assignment and knew they were mislabeling Mr. Hope, who by that point had graduated to the lowest security level in solitary after 90 days without incident. The secretary corrected the form, initialing next to her change. Unfortunately for Mr. Hope, there were more cells available for those on the less-restrictive level and this is when the disruptive cell moves escalated, often to multiple times per week.

102.    On or about March 20, 2013, Mr. Hope was interviewed by a writer from GQ, and the two discussed Mr. Hope's frequent cell moves.[18]   Within approximately two days, Mr. McMullen had Mr. Hope brought to his office and questioned him about the interview. Approximately three days later, Mr. McMullen ordered Mr. Hope moved to a cell in a more restrictive (worse) pod despite TDCJ policy of housing prisoners classified at the lowest security level, which Mr. Hope was on at the time, together in a separate area. These cell moves continued for years, with Mr. Hope often being moved into seemingly the worst cells available.

103.    This scheme included forcing Mr. Hope into cells in various states of disrepair. As one example, on or about June 30, 2015, while Polunsky Defendant Harris was Senior Warden, Mr. Hope was moved to a cell with no working lights. Inside the cell, it was so dark that the officers had to use their flashlights to move Mr. Hope into the cell. Mr. Hope objected, noting how the lack of visibility posed a security and safety risk, but he was threatened with a disciplinary

---

[18] Alex Hanneford, *Living in a Box*, GQ, Nov. 7, 2013, available at https://www.gq-magazine.co.uk/article/solitary-confinement-american-human-rights.

case for "refusing to accept housing" if he did not enter. Once moved in, Mr. Hope had to fight to be served meals, as officers required the lights to be on at mealtimes.

104. Mr. Hope was now being moved so frequently that it was difficult for him to address concerns about the inhospitable or unsanitary conditions in one cell before he was moved again. For example, in or about November 2015, Mr. Hope was moved to a cell smeared with someone else's feces and urine. He filed a grievance about this risk to his health, but he was soon moved yet again, so by the time he received a response to his grievance, it noted the issue was resolved as Mr. Hope was no longer housed in the feces-covered cell about which he had complained. The problem for Mr. Hope was that he had been moved to a different inhospitable cell. This timing began a pattern—by the time he could file a grievance and get a response, he would be in yet another different cell, a pattern that allowed the dangers go unremedied.

105. Still other cells exposed Mr. Hope to excessive heat or cold. One such cell on or around December 30, 2015 (again while Polunsky Defendant Harris was Senior Warden), had no heat when it was approximately 38 degrees outside. Mr. Hope's request for heat went unanswered, as officers put a "no heat" notation into the log. In response to his grievance, an official noted the heat was to be repaired, but temperature problems were a common occurrence in Mr. Hope's cells.

106. Mr. Hope's many cells often had something else in common: rather than being sanitized prior to officers moving Mr. Hope in, many cells contained mold and the urine, feces, and vomit of previous occupants, as well as rats and cockroaches. As but one example, in or around November 2016, officers were told to move Mr. Hope into a(nother) cell so covered in the previous inhabitant's excrement that when Lieutenant Farris and Assistant Warden Smith walked past it, they visibly recoiled from the stench. They were unable to tolerate the odor for mere

moments, but Mr. Hope was locked inside for days without even being given proper cleaning supplies to improve the filth.

## VI.  THE CLASSIFICATION DEFENDANTS ACKNOWLEDGED MR. HOPE'S SCC REVIEW HEARINGS WERE MEANINGLESS BECAUSE THEY "NEVER" PLANNED TO RELEASE HIM FROM SOLITARY

107.    As Mr. Hope's cell transfers increased, so too did the lack of clarity around the review process for his solitary classification.  And with the two-year anniversary of the disciplinary cases related to the planted screwdriver approaching, the Classification Defendants pointed to other excuses to keep Mr. Hope in segregation.

### A.  Realizing The Conspirators Went Too Far, Mr. Treon Pushed For Mr. Hope's Release—But The Conspirators Admitted Mr. Hope Would "Never" Get Out Of Segregation

108.    Several years after his retirement, Mr. Treon was visiting Polunsky and saw Mr. Hope in a segregation cell.  Mr. Treon seemed surprised and asked Mr. Hope what had happened in G.P. that led to Mr. Hope being put back in solitary.  Mr. Hope explained he was still fighting to be released from his classification to segregation back in 1995.  Mr. Treon expressed a willingness to help Mr. Hope but explained his voice may no longer carry weight.

109.    Mr. Treon contacted the SCC, explaining that he supported Mr. Hope's release to G.P., but the SCC said, in sum or substance, that its hands were tied for at least 24 months from the screwdriver incident.

110.    Later on, Mr. Hope wrote to Mr. Treon, asking if he would try again.  Mr. Treon recognized that although Mr. Hope was an escape risk years earlier, he was not the same person— he was older, demonstrated an ability to follow prison rules, and had never been "an extreme actor other than running off."[19]  Mr. Treon called the Director of Classification, whom he knew from

---

[19] The Box: 27 Years in Solitary Confinement, at 13:32-14:48 (emphasis added).

his time with TDCJ, and asked to speak about Mr. Hope:  Mr. Treon "said 'You know Dennis Wayne Hope?' and she goes, 'I sure do.'  I said 'Are y'all ever going to let him loose [from segregation]' and she goes, 'oh no, *he'll **never get out** of Seg.*'"[20]  By this point, Mr. Treon recognized "the right decision is not always made."[21]

### B.    The Classification Defendants Upheld Their Agreement For Mr. Hope To "Never" Get Out Of Segregation

111.    Just after the two-year clock lapsed from the disciplinary cases resulting from the planted screwdriver, Classification Defendant Enloe responded to the latest set of communications from Mr. Hope's advocates.  In a March 2014 response, and again in May 2014, Ms. Enloe told advocates that a "special review" of Mr. Hope was recently conducted by the deputy directors, who decided Mr. Hope must remain in segregation.  Although various SCC members had disclaimed authority to release Mr. Hope, and Mr. Hope had repeatedly asked who, in fact, had such authority, this was one of the first (but not the last) times he was told someone above the SCC had reviewed him.  Despite asking, neither Mr. Hope nor his advocates could find out which deputy directors had supposedly reviewed him, when, why, or what their role was in his review process.

112.    In the coming years, Mr. Hope and his advocates continued reminding SCC and classification officials, including through letters and emails to Classification Defendants White, Enloe, and Echessa, that the screwdriver charges had been manufactured, and that even if they ignored that information, the assault case had been downgraded to attempt and the possession of weapon charge eventually dropped altogether.  Yet, despite considerable time passing since these cases, and despite Mr. Hope and his advocates recounting the questionable nature of the charges,

---

[20] *Id.*

[21] *Id.*

the screwdriver incident continued being raised at SCC review hearings and by the Classification Defendants in their responses to Mr. Hope's advocates' inquiries.

### C. Classification Defendant Bennett Joined The Classification Defendants' Agreement To Keep Mr. Hope In Solitary

113.    Classification Defendant Bennett began appearing as an SCC member at Mr. Hope's review hearings in 2015 and 2016. At Mr. Hope's first review hearing before her, Ms. Bennett allowed Mr. Hope to make a statement and seemed to actually listen to his concerns as he recounted his experiences in segregation, including the unsanitary cells he was being shuffled between and the effects being exacted on his physical and mental health. Ms. Bennett told Mr. Hope she found no reason not to release him to G.P. She explained to a grateful Mr. Hope that she would place him in a transition program on his way to G.P. After Ms. Bennett went back to her office in Huntsville, where she worked with the other Classification Defendants, however, Mr. Hope's SCC Review Hearing Record was filled out to show that rather than be released to a transition program, Mr. Hope was to remain in solitary. No one bothered to communicate this change to Mr. Hope directly and he learned of the switch three weeks later when he received the form. At his next review hearing before Classification Defendant and then-SCC member Bennett, Mr. Hope asked Ms. Bennett why he had not been sent to the transition program. This time, Ms. Bennett repeated the party line to Mr. Hope: she was told she did not have the authority to release Mr. Hope from solitary.

114.    Classification Defendant Bennett was the first person to tell Mr. Hope that he was "high profile" so could only be released by the CID Director or Deputy Director. Around this time, Mr. Hope began hearing from several other SCC members and Classification Defendants that he could not be released because of a "high profile" status, which SCC member Armstrong claimed was reflected by a "HX Pro" abbreviation on the last page of Mr. Hope's SCC file

38

(although was not reflected on the SCC Review Hearing Records Mr. Hope received after hearings).  It remains unclear to Mr. Hope what a "high profile" status means, how someone acquires such a status, or what one can do to challenge the status or have it removed from their file.  As a practical matter, the "high profile" status again made Mr. Hope's SCC review hearings entirely meaningless.  And to the extent this "high profile" status may be tied to his decades-old escape and resulted in Mr. Hope's continued segregation, such segregation was grossly disproportionate punishment.  To the extent his "high profile" status may be tied to his advocacy and outreach—which is protected activity—the designation in itself is unlawful retaliation.

115.    As he did on other occasions, Mr. Hope filed a grievance stating that because Ms. Bennett conducted his review hearing but lacked (or claimed to lack) authority to actually release him from solitary, his review was meaningless.  Polunsky Defendant Harris denied this grievance.

## VII.  MR. HOPE ENDURED MEANINGLESS REVIEWS WHILE THE CLASSIFICATION DEFENDANTS SHIFTED ATTENTION TO OTHERS

116.    This pattern of the Classification Defendants and their subordinates pointing Mr. Hope and his advocates in other directions to find someone responsible for releasing him from segregation continued for years.

117.    In or about June 2017, Classification Defendant Enloe, SCC Chair at the time, conducted Mr. Hope's SCC review hearing, joined by Polunsky Defendant Rehse.  The circumstances were unusual.  SCC chairs rarely conducted review hearings—the chair typically remained in Huntsville and did not travel to the units for hearings.  Despite being SCC Chair, though, Ms. Enloe claimed it was not her decision whether to release Mr. Hope to G.P.

118.    Mr. Hope asked why she was reviewing him if she lacked authority to decide the very issue the review hearing was held to decide.  Ms. Enloe said she was asked to make the trip to Polunsky by her superior (and co-conspirator), Classification Defendant White, and had agreed

to deliver a message on Ms. White's behalf to Mr. Hope that, in sum or substance, his having people contact the SCC or classification officials for him would "not do him any good." Ms. Enloe occasionally appeared at subsequent review hearings for Mr. Hope as well, always at the same time as when Mr. Hope and his advocates were most active in speaking out about his mistreatment and the poor conditions of his confinement.

119.    Polunsky Defendant Rehse's presence at this June 2017 SCC review hearing gave Classification Defendant Enloe the opportunity to speak with Mr. Rehse about Mr. Hope, including in private conversations before Mr. Hope arrived and after he left the hearing.

120.    The repeated denials did not deter Mr. Hope or his supporters from advocating for him. For example, in 2017, supporters wrote multiple letters to classification officials including Classification Defendant White, urging the SCC to reconsider its past decisions.

**A.    Polunsky Defendant Rehse Agreed To Continue Mr. Hope's Frequent Moves, Now Into Worsening Conditions**

121.    In addition to being when Polunsky Defendant Rehse started joining Mr. Hope's SCC review hearings, 2017 was also the year when Mr. Hope noticed Mr. Rehse's name on the forms authorizing multiple of his cell moves. Mr. Hope thought it might help if he spoke with Mr. Rehse, so in mid-to-late 2017, Mr. Hope asked Mr. Rehse why he was moved so frequently. Mr. Rehse acknowledged he was involved in Mr. Hope's cell moves and that, in sum or in substance, "they started it and I'm not about to end it."

122.    The more Mr. Hope was shuffled between cells, the more officers remarked how pointless the moves were: someone ranking above the officers (often Polunsky Defendant Rehse) requested and authorized the moves so they were bound to carry them out but complained that moving Mr. Hope so often wasted time and created extra work, such as when they had to search for Mr. Hope to deliver his mail. Yet the frequent moves continued.

123.    The cell moves continued to expose Mr. Hope to unsafe and unsanitary conditions. One three-week period in or around late 2017 illustrates the extent of these inhospitable conditions. During this short period, Polunsky Defendant Rehse authorized Mr. Hope's placement in at least five different cells containing mold.  In one cell, the problem was so severe that, upon entering, Mr. Hope thought a previous occupant had set the wall on fire.  He later realized that what he thought was a charred wall was, in fact, a thick layer of black mold.  Mr. Hope showed the mold-covered wall to Polunsky Defendant Rehse and others, but no corrective measures were taken—Mr. Hope was even denied proper cleaning supplies.  Mr. Hope filed a grievance but that too was denied.  Eventually, Mr. Hope asked an advocate to contact the unit.  The advocate managed to talk to Warden Jefferson, who ordered Mr. Hope be moved to a different cell without mold.

124.    Still, the problem persisted.  For example, in or around October 2018, Mr. Hope was moved into yet another moldy cell—this time with black mold in the corners, the base of the wall, and near the ceiling, and with standing water pooled across the floor.  Like he had done on other occasions, Mr. Hope reported the issue, this time to Officer Palmer, who informed Mr. Hope that officials already knew this cell was contaminated with mold before they had Mr. Hope moved into it.  Mr. Hope reported the mold (and its effect on his breathing) directly to at least seven staff members ranked under Polunsky Defendant Rehse, but each refused to move Mr. Hope to a clean cell.  Instead, Mr. Hope was left in this cell much longer than others and forced to wait two months before staff initiated a maintenance work order, which also failed to remove the mold.  Frequent mold exposure caused and exacerbated Mr. Hope's respiratory issues, including as demonstrated by Mr. Hope's medical evaluation in or around November 2018.  Despite the dangers these conditions presented to Mr. Hope's physical and mental health, and despite his pleas for correction, Mr. Hope was left in squalor.  Mr. Hope saw Polunsky Defendant Harris, then Senior Warden,

several times during this period.  Mr. Harris needed no introduction as he already knew who Mr. Hope was.  When Mr. Hope asked about his frequent moves into unsafe cells, Mr. Harris indicated he would not intervene to stop it.

125.    While Polunsky Defendant Rehse was the Major over Polunsky's segregation unit, Mr. Hope was also exposed to other unsafe conditions, including chemical agents despite having done nothing warranting deployment.  This exposure occurred multiple times, including at least twice in 2017, when Mr. Rehse ordered officers to keep exhaust fans off and not to ventilate or clean after chemical agents had been deployed in close proximity to, but not because of, Mr. Hope.

126.    The regular cell moves, enacted first by Mr. McMullen and continued by Mr. Rehse, have caused physical and psychological harm to Mr. Hope.  The coordinated attack on Mr. Hope through his living conditions left Mr. Hope constantly disoriented and perpetually unsafe. Mr. Hope was forced to remain on high alert as he tried to adjust to different surroundings, with countless new noises from new neighbors—while also bracing himself against a constant threat of retaliation.  Mr. Hope developed persistent insomnia, routinely sleeping only several hours per night, and often in interrupted spurts, including because officers sometimes moved him between cells in the middle of the night.  Additionally, these frequent moves caused delays to Mr. Hope's mail, which impeded his ability to correspond with officials, his advocates, and media members. On at least one occasion, official paperwork from the SCC was not properly delivered to Mr. Hope.

127.    While any move is inherently stressful, here, the damage was only magnified by the frequency with which Mr. Hope was moved and the conditions he was forced into, as well as the effects of his long-term isolation without meaningful access to mental health care.  Mr. Hope had no agency to get himself out of segregation, and no agency over his conditions within segregation.  Due to the frequent cell moves, Mr. Hope suffered, and continues to suffer, from

anxiety, depression, obsessive compulsions, diminished ability to concentrate, confusion, memory loss, paranoia, thoughts of self-harm, and insomnia, and conditions such as hypertension (high blood pressure) were exacerbated.

128.    Being constantly shuffled to new cells caused Mr. Hope harm and frequently exposed him to physically unsafe conditions. Mr. Hope was regularly moved into cells that were in disrepair or were so unsanitary as to be unfit for human occupancy. Polunsky Defendants Rehse and Harris, as well as the Classification Defendants, knew of these conditions—because Mr. Hope personally showed or told each of them—but disregarded the risks posed: Mr. Rehse continued authorizing cell moves, Mr. Harris ignored Mr. Hope's expressed concerns about his health, and the Classification Defendants continued finding excuses to justify his indefinite placement in segregation. Further, each of the Classification Defendants knew of the inhumane conditions of Mr. Hope's confinement and the effect it was having on Mr. Hope. Instead of taking steps to have those conditions corrected or to have Mr. Hope released from segregation, the Classification Defendants continued rubber stamping his placement in disregard of the risks to Mr. Hope.

129.    Despite Defendants' design and agreement to frustrate his ability to do so, Mr. Hope filed grievances related to the aforementioned cell moves, thereby exhausting available remedies.

**B.    Polunsky Defendant Rehse Participated In Further SCC Review Hearings**

130.    Polunsky Defendant Rehse was present at Mr. Hope's next review hearing in or around December 2017, this time with Classification Defendant Fiveash and Amanda Maddox (who had also been part of the team that collected the planted screwdriver in February 2012, and that gassed Mr. Hope with chemical agents and then left him naked and exposed for days in the aftermath). This review hearing, like others, was over quickly. Ms. Fiveash told Mr. Hope she lacked authority to release him. Mr. Hope asked if and how he could speak to someone with the authority to release him. Ms. Fiveash indicated that only the Director of TDCJ could release Mr.

Hope to G.P., and although Mr. Hope would have to speak to someone outside the SCC to get released, the SCC would see him again in six months.  Mr. Rehse remarked to Mr. Hope, in sum or in substance, that Mr. Hope was his own worst enemy, indicating that his treatment was tied to Mr. Hope's continued advocacy efforts.

131.    Polunsky Defendant Rehse joined a third consecutive SCC review hearing in or around June 2018 with another SCC member.  Outside of his review hearings, Mr. Hope asked Mr. Rehse what he thought it would take for Mr. Hope to be released to G.P., only to have Mr. Rehse respond that he didn't believe Mr. Hope would ever be released from segregation.

## VIII.  SCC MEMBERS REVEALED MR. HOPE'S HEARINGS WERE MERE "WELFARE CHECKS," NOT DESIGNED FOR MEANINGFUL REVIEW

132.    As time wore on, classification and TDCJ officials continued to provide Mr. Hope with conflicting information.  On or about August 11, 2017, in response to a grievance, Assistant Regional Director Matt Gross told Mr. Hope that "The State Classification Committee can make the decision to release an offender from Administrative Segregation; however, if an offender has an escape on file, justification must be forwarded to the Chairman of Classification for approval. You have been reviewed by a special administrative committee for offenders who have been classified to Administrative Segregation for over 15 years."  Mr. Hope had heard reference to an administrative committee once before—in or around January 2013, when SCC member Bilnoski told Mr. Hope that because the committee had reviewed his file, Mr. Bilnoski could not make an independent decision—but no one had raised it since despite Mr. Hope's continued questions.  One of Mr. Hope's advocates called TDCJ and learned that Classification Defendant Echessa was the committee's head.

133.    Although Mr. Echessa agreed he had the authority to make a release decision on his own, he insisted that he would not get involved unless he received a request or recommendation

from classification first (which contradicted information from other of the Classification Defendants and the examples where committee members recommended that Mr. Hope be released). To further confuse matters, also in August 2017, Mr. Hope received a letter from Classification Defendant Enloe stating that no special review process applied to Mr. Hope and he would be evaluated again at his next regular SCC review hearing. In short, it was entirely unclear to Mr. Hope whether an SCC member could authorize his release from segregation at a review hearing or whether he was subject to some modified review procedure and, if so, what that procedure was based on—his former escape, the purported "unusual and difficult" nature of his circumstances, his "high profile" status, or the length of time he had been in solitary confinement.

134.    In or around December 2018, at an SCC review hearing, Mr. Hope was told by SCC member Armstrong that a group of TDCJ directors had reviewed Mr. Hope's file years earlier and had not released him to G.P., that Mr. Hope had not been reviewed for release in the years since, and that Mr. Armstrong too felt he lacked authority to do so. Instead, Mr. Armstrong indicated that Mr. Hope's previous escape in his record meant he would remain in segregation for the entirety of his sentence. Assistant Warden Perez, who was also present, seemed to agree, stating that the SCC will not release to G.P. anyone who had escaped before. SCC member Thompson similarly told Mr. Hope she did not have the authority to release him from segregation because of his previous escape. At Mr. Hope's review hearing in or around December 2019, SCC member Trevino went further, reporting to Mr. Hope that his SCC hearings were mere "welfare checks" because TDCJ directors reviewed his case only once every 10 years.

135.    As he had done for years, Mr. Hope filed grievances regarding these hearings and the lack of meaningful review available to him. He and his advocates sent additional letters to the Classification Defendants and others outlining their concerns with what Mr. Hope was told at

review hearings and pleading for someone with authority to actually review him for release from

segregation.  Mr. Hope survived these unconstitutional conditions of confinement and continued

to advocate for himself, in the face of sham proceedings and retaliation, for nearly three decades.

## IX.    MR. HOPE WAS RELEASED FROM SOLITARY BUT EXPERIENCED FURTHER MISTREATMENT

### A.    Mr. Hope Was Released From Solitary In 2022 Because Of The Supreme Court's Impending Review Of His Claims In This Case

136.    After 27 years in solitary confinement, Mr. Hope was *finally* released to G.P. on or

about February 7, 2022—one week after, and seemingly because, he filed a Petition for Writ of

Certiorari with the United States Supreme Court to challenge dismissal of his Eighth Amendment

and other claims in this case.  *See Hope v. Harris*, No. 20-40379, Dkt. No. 3 (U.S. Jan. 28, 2021).

137.    Mr. Hope originally filed this case in February 2018, seeking both injunctive relief

and damages.  Dkt. No. 1; *see also* Dkt. No. 15.  Following decisions on a motion to dismiss, Dkt.

No. 28, and an appeal to the Fifth Circuit, *Hope v. Harris*, 861 F. App'x 571 (5th Cir. 2021), Mr.

Hope sought certiorari regarding whether prolonged solitary confinement can, under some

circumstances, violate the Eighth Amendment, a question on which there is a longstanding circuit

split, and whether defendants violated his right to procedural due process.  *Hope v. Harris*, No.

20-40379, Petition for Writ of Certiorari, Dkt. No. 3 at i (U.S. Jan. 28, 2021).

138.    Seemingly to avoid the Supreme Court's review of his case, Mr. Hope was finally

released from solitary confinement on February 7, 2022.  The Polunsky and Classification

Defendants then argued that his eleventh-hour release mooted his claims for injunctive relief.[22]

---

[22] Mr. Hope reserves the right to pursue injunctive relief if he is again placed in segregation.  To date, Mr. Hope has already been re-placed in solitary on two separate occasions, both in November 2022 for a total of approximately five days, while at the Estelle Medical Facility for an eye exam. Neither was pursuant to proper procedure.

*Hope v. Harris*, No. 20-40379, Response to Petition for Writ of Certiorari, Dkt. No. 13 at 12–13 (U.S. May 9, 2022).

139.    At the time of his release from solitary, no explanation was provided to Mr. Hope about why he was suddenly being released to G.P., or on whose authority, after so many years of having his self-advocacy go entirely unnoticed.  Indeed, his most recent SCC review hearing had been on or about January 6, 2022, just a month before his release.  Although he had the rights to attend and to make or submit statements at SCC review hearings, Mr. Hope was told he was not permitted to attend this January review hearing due to COVID-19, and he had not received enough advance notice to be able to mail a statement to the SCC for consideration.  Mr. Hope's release to G.P. was again denied at this January 2022 review hearing.

140.    On May 4, 2022, now-Director of Classifications Timothy Fitzpatrick provided a declaration as part of Defendants' briefing to the United States Supreme Court.  There, Mr. Fitzpatrick claimed that "[o]n Feb. 4, 2022, the State Classification Committee held a hearing to consider Dennis Wayne Hope's . . . continued classification in Restrictive Housing. . . . The Committee reached this decision [to release him to G.P.] after extensive consideration of all prior criminogenic history, institutional adjustment, the recommendation of Polunsky Unit Administration concerning current behavior, and in consultation with the leadership of TDCJ."  *Hope v. Harris*, No. 20-40379, Suggestion of Mootness and Brief in Opp., app., Dkt. No. 21-1065 at 1a-3a (U.S. May 4, 2022).  This declaration was the first time Mr. Hope had heard about this alleged irregularly scheduled review hearing, purportedly conducted while Classification Defendant Bennett was SCC Chair.  Mr. Hope had not received notice prior to the review hearing, was not given an opportunity to attend or present statements, and still to this day has not received a written record of the decision.

141.    In the 27 years preceding his release from solitary, Mr. Hope never had SCC review hearings in back-to-back months.  The closest irregularity was the July 2007 review hearing where Ms. Jones claimed the SCC had no record of the April 2007 review hearing at which Mr. Rogers first decided to release Mr. Hope to G.P.  The unprecedented timing further calls into question the motive for this impromptu February 2022 review hearing outside of Mr. Hope's presence.

**B.    Mr. Hope Transitioned To Ellis Unit, And Was Met With Ellis Defendants Simmons' and Clark's Excessive Use Of Force**

142.    In February 2022, Mr. Hope was transferred from solitary to a transition program at the Ellis Unit in Huntsville, Texas—where the SCC is also headquartered.  While there, Ellis Defendants Simmons and Clark used excessive force to injure Mr. Hope, only relenting when hospital medical staff and an Ellis warden stepped in with corrective action.

143.    From Mr. Hope's first day at Ellis, it was clear that SCC and classification officials were unhappy with his release from solitary, and they let the Ellis Unit staff know it.  Classification Defendant and now-SCC Chair Bennett and Director of Classification Fitzpatrick came to Ellis to deliver an ominous message in front of Mr. Hope's new housing section and staff: Mr. Fitzpatrick had a long career in front of him and would "remember" Mr. Hope.  Mr. Hope never had a cell mate while at Ellis despite double-celling being standard, and heard this decision was made at the direction of Classification Defendant Bennett, who dictated that Mr. Hope must be housed alone.

144.    While at Ellis, Mr. Hope participated in a cognitive intervention program that included a journaling component.  Mr. Hope wrote in his journal about his time in solitary, mistreatment he had experienced, and wanting to effect change in how other prisoners in solitary are treated.  Mr. Hope shared this entry in front of the class and instructor in May 2022.  Although he did not know it at the time, Mr. Hope would never see his journal again.

145.    On or about May 22, 2022, Mr. Hope experienced respiratory distress and reported severe difficulty breathing.  When evaluated, on-site medical providers requested an immediate emergency medical transport to Huntsville Memorial Hospital.  Ellis Defendant Simmons and Sergeant Schwartz were responsible for preparing Mr. Hope for transport.  Mr. Schwartz first placed restraints on Mr. Hope, leaving the appropriate one-finger width of space between the handcuffs and Mr. Hope's wrists.  Then, without justification and despite Mr. Hope's emergency medical needs, Ellis Defendant Simmons re-fastened the handcuffs, clamping them so tightly that the metal bit into Mr. Hope's wrists.  Ms. Simmons then told Mr. Hope to "get used to it."  During the ambulance ride to the hospital, Mr. Hope's wrists and hands began going numb due to the tightness of the handcuffs.

146.    At the hospital, Ellis Defendant Clark met the ambulance and escorted Mr. Hope to a treatment bed.  A nurse saw Mr. Hope's now-purple hands and asked Mr. Clark why the restraints were so tight.  Mr. Clark responded, in sum or substance, "it's like that for a reason."  The nurse told Mr. Clark that the overly tightened cuffs were causing Mr. Hope to lose circulation to his hands, but Mr. Clark merely repeated that he had a reason.

147.    At Mr. Hope's treatment bed in the emergency room, a different nurse asked Ellis Defendant Clark why Mr. Hope's handcuffs were so tight that his hands were discolored and swollen.  This nurse received the same vague explanation that there was a reason.  Unsatisfied, the nurse pressed for the reason, but was shut down by Mr. Clark's response, in sum or in substance: "you handle the medical, we'll handle the security."  Throughout that day and evening, Mr. Hope complained of severe pain in his wrists to no avail.  His hands grew more swollen and purple.

148.    Mr. Hope was diagnosed with pneumonia.  The next afternoon, a doctor came to Mr. Hope's hospital room.  Almost immediately, the doctor saw Mr. Hope's wrists and hands and

49

left to speak with Captain Flores just outside Mr. Hope's room.  Captain Flores called her supervisor, the warden at the Byrd Unit, who instructed her to call Ellis Warden Kelly Strong. Warden Strong instructed Captain Flores to apply the handcuffs according to policy, meaning to loosen them until there was one finger's width of space between each handcuff and wrist.

149.    The damage had already been done, and Mr. Hope experienced significant pain in his wrists and hands throughout his week in the hospital.  Nurses had to continually bandage Mr. Hope's wrists due to the damage inflicted by Ellis Defendants Simmons and Clark.  Since this incident, Mr. Hope experiences periods of numbness in his hands, most severely around the base of his right thumb.[23]  The pain flares up anytime he is required to wear restraints, which he must whenever he is transported for medical care offsite.

150.    Mr. Hope filed grievances related to the aforementioned use of excessive force, thereby exhausting available remedies.

151.    After his time at Ellis, Mr. Hope was transferred to the Connally Unit, and he currently remains housed there.

## X.    DEFENDANTS' ACTIONS RESULTED IN PHYSICAL AND MENTAL HARM TO MR. HOPE

152.    Mr. Hope's physical and mental health have deteriorated after spending half of his life in isolation, much longer than any security purpose required, and frequently in inhumane conditions unfit for human habitation.  He has tried to stave off the effects of solitary as much as possible.  For example, Mr. Hope noticed his vocabulary diminishing, so he tried to focus on speech patterns in radio programming.  Ultimately, he believes even with his efforts that his physical ability to speak and cognitive ability to converse have deteriorated.

---

[23] Indeed, Mr. Hope was diagnosed with paresthesia (numbness) in his right thumb when seen by medical staff at the Connally Unit months later.

153.    In some instances, Defendants' acts compounded the effects of solitary.  For example, Mr. Hope's eyesight has declined, in part due to regular factors such as age, but also in part because Defendants repeatedly moved him into cells with no or few working lights, leaving him to strain through darkness to write, read, or even see his food to eat.

154.    Examples of other harms include, but are not limited to, the following:

**A.    Respiratory Issues**

155.    Mr. Hope suffered from upper respiratory issues as a result of his repeated and intentional exposure to mold.  Living in squalor in cells that had not been cleaned prior to staff moving Mr. Hope into them, and often with only minimal or no proper cleaning supplies available to him, exposed Mr. Hope to mold unnecessarily.  These conditions continued even after Mr. Hope made these issues known, causing still further health issues.

**B.    Lower Back, Shoulder, and Knee Pain**

156.    Mr. Hope suffers from chronic, burning lower back and leg pain exacerbated by years spent in a cramped space with minimal opportunities for recreation.  Although staff initially allowed Mr. Hope a brace to support his back, a doctor rescinded that order in the early 2000s, instead finding that Mr. Hope needed exercise and physical therapy to strengthen his back.  But without the back brace and without proper exercise and therapy, Mr. Hope's back pain increased.  Despite past orders for physical therapy and an MRI, TDCJ provided only ibuprofen, which continued to be the primary method of treatment for years to come.

157.    By early 2023, Mr. Hope's daily life had become undeniably restricted by his back pain, which by then was worsening into his hip.  Mr. Hope's complaints led a health care provider to order an MRI and look into additional and alternative methods of care.  Mr. Hope's MRI revealed multilevel degenerative changes in his spine, for which a doctor ordered physical therapy in or around August 2023 (although Mr. Hope has not yet had a physical therapy session to date).

While this physical therapy is vital for improving Mr. Hope's quality of life, the transportation to and from his physical therapy sessions requires 12 hours of being handcuffed in the transport vehicle—additional exposure to hardship that could have been avoided if addressed sooner.

158.    Mr. Hope contends with shoulder and knee pain arising from his extended time in solitary confinement.  There, Mr. Hope had to be handcuffed to leave his cell.  While this restraint was imposed for regular activities, it was also imposed during the hundreds of times Mr. Hope was moved to a new cell with no apparent security purpose, as well as the numerous times he was cuffed because he was kept in solitary after he was no longer an escape risk and after the SCC first decided he could be released to G.P. in 2007.  To be handcuffed, Mr. Hope had to crouch down, face the back of his cell, and extend his wrists behind him towards the slot in his door approximately two feet off the ground.  Repeatedly assuming this unnatural position placed enormous strain on Mr. Hope's shoulder and knees, leading to persistent pain.  In or around December 2020, Mr. Hope received a steroid shot in his left shoulder, which helped, but he was prevented by prison staff from regularly receiving that treatment.

### C.    Insomnia

159.    Mr. Hope began suffering from intense nightmares and then insomnia when he was housed with death row inmates at Polunsky starting in 2007.  In his nightmares, TDCJ officials mixed him up with death row prisoners and came to take him to his execution.  Over time, his sleeplessness worsened to the point where he was lucky to get even four hours of interrupted sleep in a night.  The conditions of solitary only made matters worse: At virtually all times of the day and night, other prisoners would bang on doors, talk to themselves, or yell or urinate through their cells.  Guards came and went at all hours, causing gates to bang and slam.  Self-harm and suicide attempts are, sadly, prevalent in solitary confinement, causing further disruptions.  These factors were compounded by the frequent cell moves, which could and sometimes did occur in the middle

of the night, and that left him constantly disoriented, making the new noises and voices impossible to ignore.  Throughout the years there were many nights when he was unable to sleep at all.  To this day, Mr. Hope continues to suffer from insomnia.

### D.    Other Psychological Harm

160.    Mr. Hope suffered significant psychological harms attributable to Defendants' actions (or inactions as the case may be).  Mr. Hope has experienced, for example, lasting anxiety, depression, obsessive compulsions, suicidal ideations, and emotional numbness.  In or around late 2014, Mr. Hope began experiencing visual and auditory hallucinations.[24]  At times, Mr. Hope has resorted to biting his own arm to remind himself he was alive.

161.    Some of Mr. Hope's psychological harm is unsurprising, as the debilitating effects of solitary confinement are well-established and widely recognized.  For example, scholars have repeatedly documented symptoms from solitary confinement to include "severe anxiety or panic disorder, disordered thinking including paranoia, compulsive activities including pacing and repeatedly cleaning the cell, difficulty concentrating, memory problems, agitation, irritability, hyperawareness, strong startle reaction, mounting irrational anger, impairment of judgement, despair and suicidal inclinations."[25]  Likewise, researchers have documented how such symptoms

---

[24] When Mr. Hope raised his concerns with mental health staff—hoping they could offer some insight or understanding—they offered only medication, which Mr. Hope declined, fearing the side effects of heavy psychotropic drugs.

[25] Terry A. Kupers, *Supermax Prison Isolation in Pre-Crime Society*, in THE PRE-CRIME SOCIETY 293-94 (Bruce Arrigo & Brian Sellers eds., 2021).

can be long-lasting, all the way up to increased risk of death,[26] and sufficient to constitute a SHU Post-Release Syndrome.[27]

162.    Indeed, in 2014, Lance Lowry, the president of AFSCME Local 3807, the union representing Texas correctional employees, called for regulation to limit solitary confinement because of the effects: "[r]esearch shows that depriving inmates of human contact for long periods of time may exacerbate mental crisis, assaultive behavior, antisocial behaviors, and acute health disorders.  Psychological effects due to lack of sensory stimulation can include anxiety, depression, anger, cognitive disturbances, perceptual distortions, obsessive thoughts, paranoia, and psychosis."[28]

163.    Defendants compounded these effects as Mr. Hope remained in solitary for additional years and was subjected to traumatic incidents and inhumane conditions.  For example, and in addition to other examples noted in previous sections:

⏱ In 2007, while housed with those on death row, Mr. Hope started to experience a sense of suspended animation and despair that has come to be known as "Death Row Syndrome."  His neighbors were sentenced to death, and he felt at the same time deeply affected yet also unmoved by their deaths.  Even after then-Texas Senator Whitmire intervened on Mr. Hope's behalf to have him moved off of death row, Mr. Hope still felt haunted by the experience.  Death

---

[26] Lauren Brinkley-Rubinstein, Josie Sivaraman, David L. Rosen, *Association of Restrictive Housing During Incarceration With Mortality After Release*, 2 JAMA OPEN NETWORK 19 (Oct. 4, 2019).

[27] Terry A. Kupers, *The SHU Post-Release Syndrome: A Preliminary Report*, 14 CORRECTIONAL MENTAL HEALTH REP. 6, 81 (Mar./Apr. 2016).

[28] Statement of Lance L. Lowry, AFSCME Texas Correctional Employees Local 3807 (Feb. 25, 2014), https://solitarywatch.org/wp-content/uploads/2014/02/Lance-Lowry-Senate-Hearing-Submission.pdf.

row prisoners would still be walked by Mr. Hope's cell on their way to being executed. Mr. Hope would be overwhelmed by despair, comparing his own lack of hope to theirs. He projected their fate onto his own experience of slow death by the state.

⊙ Frequent cell moves triggered obsessive compulsions for Mr. Hope. Moving so often required him to prioritize his belongings so he could more quickly pack and unpack them with each new cell. Mr. Hope began to feel as if he were living in a puzzle, and if any one thing were out of place, it caused him immense distress. He became so familiar with his small inventory of belongings that, for example, he was able to identify when address pages were confiscated from his notebook but not properly recorded on property forms.

⊙ To this day, Mr. Hope panics when he sees discoloring or spots on the walls. Because of his many, many cell moves, in particular to cells covered in mold, Mr. Hope was constantly disoriented and on high alert for additional signs of mold or other health hazards. Mr. Hope would even question if spots on the wall were real. It was an unsettling feeling, as all the cells looked the same, and he had been in so many that were alike, save for small differences like a chip in the paint or discoloration of the floor, and he began to, and continues to, fixate on such differences.

⊙ Even now in G.P., certain scenarios continue to trigger Mr. Hope, causing significant distress and conjuring traumatic memories.

164.   During Mr. Hope's time in solitary, he was denied meaningful mental health care. Mr. Hope wanted to work through years of trauma from his time at Polunsky rather than be overly

medicated, which seemed common around him.  But he was denied enrollment in a mental health diversion program because he refused heavy-duty psychiatric medications, as was his right, and seemingly also because of the ambiguous "high profile" designation that still has not been explained to him.  Still, Mr. Hope expressed concerns about his mental health, including in letters as well as a grievance, which Defendant Harris denied, writing that no action was warranted.

165.    Mr. Hope's mental health crises required serious attention and could not be fixed with a simple prescription. In 2021, Mr. Hope wrote a note that epitomized his struggle: "I have now been in this cell 33 days without recreation.  I have been in isolation for over 26 years.  My depression has gotten worse . . . [and] my bouts with anxiety are daily . . . . There are times I am hearing voices and seeing things that aren't there. . . .  I need to talk to someone about how to manage these things."  In response, Mr. Hope was "seen cell side" but medical staff merely suggested he keep himself occupied as a distraction.

166.    Even after Mr. Hope's release to G.P., he continues to suffer the physical and mental effects of Defendants' mistreatment over his decades of isolation.

### FIRST CLAIM FOR RELIEF

*Cruel and Unusual Punishment Under the 8th Amendment to the U.S. Constitution*
*Based on Conditions of Solitary Confinement*
*(Polunsky Defendants and Classification Defendants in their Personal Capacities)*

167.     Mr. Hope incorporates paragraphs 1 through 166 as though fully set forth herein.

168.    The Eighth Amendment, enforceable pursuant to 42 U.S.C. § 1983, prohibits "cruel and unusual punishments."  U.S. Const. amend. VIII.  In its prohibition on such punishments, the Eighth Amendment requires prison officials to provide humane conditions of confinement.  *See, e.g.*, *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  Conditions of confinement within a prison violate the Eighth Amendment when (1) the conditions, either alone or in combination, pose a

sufficiently serious threat to a prisoner's health or safety, such that a prisoner is deprived of the minimal measure of life's necessities and (2) prison officials act with deliberate indifference to the threat. *Id.* at 834; *see also Wilson v. Seiter*, 501 U.S. 304 (1991).

169.    Solitary confinement is a form of punishment that implicates Eighth Amendment concerns when paired with other intolerable conditions. Although not dispositive, the length of time in solitary confinement "cannot be ignored" in deciding whether conditions of confinement meet constitutional standards. *Hutto v. Finney*, 437 U.S. 678, 686-87 (1978).

170.    Forcing Mr. Hope to live alone for 27 years in unsanitary environments and, at times, without even minimum necessities (e.g., a blanket in February, a single set of clothing, a dry cell, etc.) constituted serious deprivations of the basic needs for safe and sanitary living conditions, for hygiene, for sleep and healthcare, and for meaningful human interaction, among others. Such deprivations were worsened by the extreme length of time Mr. Hope spent in inhumane conditions in solitary confinement and by the excessive number of cell moves.

171.    Beginning in 2007, when Mr. Hope was first housed in solitary confinement at Polunsky, and especially after 2012 when Mr. Hope was moved to over 260 different cells, Mr. Hope was repeatedly housed in deplorable conditions and routinely exposed to urine, feces, vomit, rats, roaches, and mold, without the ability to properly disinfect and clean his cells. As a few examples of the many inhospitable or dangerous cells Mr. Hope was confined in, one cell's wall was so covered with mold that Mr. Hope initially thought the wall was charred, another had no working lights, and still others exposed Mr. Hope to extreme temperatures or leaked water when it rained. No prisoner should experience these conditions, yet Mr. Hope was forced to endure these conditions while simultaneously being deprived of the ability to participate in prison programming, work a job, and participate in the meaningful human interaction that is a part of G.P. Worse still,

and again unlike what he would have experienced if housed in G.P., Mr. Hope had no way to escape the unsanitary conditions present in many of his tiny cells because he was confined to his cell for almost every minute of every day.

172.    Mr. Hope's physical and mental health declined.  Mr. Hope frequently became ill from exposure to mold, filth, and cold.  He experienced, among other ailments, depression, hopelessness, despair, suicidal ideation, and hallucinations.  He began to suffer, and still suffers, from chronic insomnia.  Mr. Hope developed lasting, chronic back pain exacerbated by years of restricted movement and protracted shoulder and knee pain due to being repeatedly handcuffed through his cell door at an unnatural angle, a condition that is unique to solitary confinement.

173.    Polunsky Defendants Rehse and Harris were aware of the inhumane conditions Mr. Hope endured, and the serious risks such conditions posed.  Mr. Rehse authorized many of Mr. Hope's cell transfers, and Mr. Rehse was familiar with the deplorable conditions within those cells—including because Mr. Hope personally showed Mr. Rehse mold in his cell.  Mr. Hope personally made Mr. Rehse and Mr. Harris aware of his frequent moves and the dangerous conditions within those cells, and Mr. Hope filed multiple grievances about his cell conditions. Despite their knowledge, Mr. Rehse and Mr. Harris did nothing to prevent or alleviate the inhumane conditions and instead continued to move him, even placing Mr. Hope in five different cells containing mold in one three-week period in 2017.  Nor did either Polunsky Defendant help Mr. Hope access mental health care (even after Mr. Hope expressed concerns to them about needing help), take meaningful steps to transition Mr. Hope out of solitary, or decrease the rate of his unnecessary cell moves.  The Polunsky Defendants' awareness of the deplorable conditions of confinement and refusal to remedy them constituted significant deprivations of basic human needs, in violation of the Eighth Amendment.

174.    The Classification Defendants were likewise aware of the deplorable conditions Mr. Hope experienced.  Mr. Hope raised these conditions to the Classification Defendants, both directly and indirectly through advocates, at SCC review hearings, in letters and emails, and on phone calls.  The Classification Defendants also had significant experience within the prison system to understand the unique hardships imposed by solitary confinement and the negative health effects of extended time in isolation.  Yet the Classification Defendants ignored this knowledge and instead relegated Mr. Hope to remain in these deplorable conditions and in segregation for year after year.

175.    Polunsky Defendant Rehse and the Classification Defendants were also part of a conspiracy directed, in part, at keeping Mr. Hope in solitary indefinitely which increased the length of time he was confined under inhumane conditions.  As entrants into the conspiracy, each shares responsibility.  *Bevill v. Fletcher*, 26 F.4th 270, 283-84 (5th Cir. 2022).

176.    The Polunsky Defendants and Classification Defendants knew about the inhumane and unsanitary conditions of Mr. Hope's confinement and acted with malice or reckless indifference to Mr. Hope's rights by, among other acts, failing to remedy the deplorable conditions.

177.    Mr. Hope seeks relief in the form of compensatory and punitive damages against the Polunsky Defendants and Classification Defendants to make him whole for the years of pain and suffering he experienced while relegated to solitary confinement in such conditions.

### SECOND CLAIM FOR RELIEF

*Retaliation Under the 1st Amendment to the U.S. Constitution*
*(Polunsky Defendant Rehse and Classification Defendants in their Personal Capacities)*

178.    Mr. Hope incorporates paragraphs 1 through 166 as if fully set forth herein.

179.    The First Amendment, enforceable pursuant to 42 U.S.C. § 1983, prohibits retaliation against a prisoner for engaging in a protected activity.  U.S. Const. amend. I.  A prisoner

will prevail on a claim for retaliation if he establishes (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his exercise of that right, (3) a retaliatory adverse act, and (4) causation. *See*, *e.g.*, *Morris v. Powell*, 449 F.3d 682, 684 (5th Cir. 2006).

180.    Filing grievances against prison staff is protected First Amendment activity. *See*, *e.g.*, *Woods v. Smith*, 60 F.3d 1161, 1164 (5th Cir. 1995).

181.    Contacting outside advocates as part of one's right to use the mail to access the courts and government officials is protected First Amendment activity. *See, e.g.*, *Woods*, 60 F.3d at 1164 (exercising one's right of access to the courts is protected First Amendment activity); *Taylor v. Sterrett*, 532 F.2d 462, 470 (5th Cir. 1976) (agreeing that mail is protected from censorship when transmitted between prisoners and courts, governmental agencies, lawyers, or press because such protection is "compelled by the constitutional rights of the prisoners").

182.    Communicating with the media is protected First Amendment activity. *See*, *e.g.*, *Pell v. Procunier*, 417 U.S. 817, 822 (1974); *Taylor*, 532 F.2d at 479, 481.

183.    Mr. Hope engaged in protected First Amendment activity. He filed grievances, spoke with the media, asked advocates to speak on his behalf, and wrote letters to TDCJ and state officials, including to the Classification Defendants, starting no later than 2011.

184.    The Classification Defendants were aware of Mr. Hope's protected First Amendment activity. Indeed, they were the recipients of many of Mr. Hope's and his advocates' letters, phone calls, and emails. Mr. Hope also filed grievances about SCC review hearings conducted by Classification Defendants Bennett, Enloe, and Fiveash, as well as about the SCC and classification generally. Polunsky Defendant Rehse was aware of Mr. Hope's protected activity, including from Mr. Rehse's participation in Mr. Hope's review hearings. Other co-conspirators

also knew of Mr. Hope's protected activity; letters were sent to and grievances filed about Ms. Jones, and Mr. Hope filed grievances and spoke to officials about Mr. McMullen's actions.

185.    Polunsky Defendant Rehse and the Classification Defendants were on notice under decades-old caselaw that filing grievances, reaching out to and through outside advocates, and speaking to the media is protected First Amendment activity.  Moreover, Defendants had notice that prisoners have these rights based on TDCJ's own policies and trainings.

186.    The Classification Defendants, especially Classification Defendant White, were nonetheless angered by Mr. Hope's protected activity.   The Classification Defendants and Polunsky Defendant Rehse intended to retaliate against Mr. Hope and warned Mr. Hope against continuing his protected activities.  For example, Polunsky Defendant Rehse remarked, in sum or in substance, that Mr. Hope was his own worst enemy, indicating his conditions were tied with his efforts to challenge his segregation conditions.  Classification Defendant Enloe was known to appear at Mr. Hope's SCC review hearings only during periods when Mr. Hope and his advocates were being the most vocal.  And Ms. Enloe, at the direction of Ms. White, communicated to Mr. Hope that having his advocates contact classification would not benefit Mr. Hope.

187.    In reaction to Mr. Hope's protected First Amendment activity, the Classification Defendants and Polunsky Defendant Rehse retaliated against Mr. Hope.  Their retaliatory acts included, but were not limited to, extending Mr. Hope's solitary confinement indefinitely, planting a screwdriver in his cell and using the resulting manufactured disciplinary charges as excuses for his continued segregation, and relocating Mr. Hope to hundreds of different cells.  These retaliatory actions often followed soon after Mr. Hope had engaged in a protected activity and were designed to discourage Mr. Hope from continuing to exercise his First Amendment rights.

188.    Polunsky Defendant Rehse and the Classification Defendants were also part of a conspiracy that was directed, in part, at punishing Mr. Hope for challenging his confinement conditions and Defendants' actions toward him, and at silencing Mr. Hope and his advocates so their actions could go undetected.  Defendants' co-conspirators carried out additional retaliatory acts against Mr. Hope in furtherance of the conspiracy, such as by confiscating Mr. Hope's typewriter that he used to type grievances and by moving a chemical-covered Mr. Hope into a cell with a disabled sink so he had no way to clean himself for a week-long period.  As entrants into the conspiracy, Polunsky Defendant Rehse and the Classification Defendants each share responsibility for their co-conspirators' acts.  *Bevill*, 26 F.4th at 283-84.

189.    Polunsky Defendant Rehse and the Classification Defendants knew of Mr. Hope's right to engage in First Amendment activity, yet retaliated against Mr. Hope for such activity and did so with malice or reckless indifference to Mr. Hope's rights, including, extending Mr. Hope's time in solitary indefinitely, manufacturing disciplinary charges, confiscating his typewriter, and moving him to hundreds of cells, among other acts as pled in this complaint.

190.    Mr. Hope seeks relief in the form of compensatory and punitive damages against Polunsky Defendant Rehse and the Classification Defendants for repeatedly retaliating against him and causing him pain and suffering due to his participation in protected First Amendment activity.

### THIRD CLAIM FOR RELIEF

*Violation of Procedural Due Process Under the 14th Amendment to the U.S. Constitution*
*(Polunsky Defendant Rehse and Classification Defendants in their Personal Capacities)*

191.    Mr. Hope incorporates paragraphs 1 through 166 as if fully incorporated herein.

192.    The Due Process Clause of the Fourteenth Amendment, enforceable via 42 U.S.C. § 1983, provides that no state shall deprive any person of liberty without due process of law.  U.S. Const. amend. XIV.  To determine what process is due, a court determines whether there is a

liberty interest that has been interfered with by the state, and whether the procedures "attendant upon that deprivation were constitutionally sufficient." *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 228-29 (5th Cir. 2020). The constitutional sufficiency of procedures is determined by weighing three factors: (1) the private interest that will be affected by the official action, (2) the risk of erroneous deprivation of that interest through the procedures used, and (3) the state's interest, including the function involved and the fiscal and administrative burdens that additional or substitute procedures would entail. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

193.    Prison officials must engage in the periodic review of the confinement of prisoners in segregation and may not use segregation "as a pretext for indefinite confinement." *Hewitt*, 459 U.S. at 477 n.9. Periodic reviews, like any process that is constitutionally due, must be "meaningful." *See*, *e.g.*, *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965).

194.    Conversely, if an official engages in "perfunctory exchanges" regarding a prisoner's eligibility for release from solitary and fails to explain their reasoning for retaining a prisoner in solitary, then the official has failed to provide adequate due process. *Wilkerson v. Stalder*, No. 00-304-JJB, 2013 WL 6665452, at *11 (M.D. La. Dec. 17, 2013), *aff'd sub nom. Wilkerson v. Goodwin*, 774 F.3d 845 (5th Cir. 2014). Periodic reviews are similarly not meaningful if the decisionmaker at the review either lacks or disclaims the authority to release the person being "reviewed" from segregation. *See Ruiz v. Estelle*, 503 F. Supp. 1265, 1366 (S.D. Tex. 1980), *aff'd in part, rev'd in part on other grounds*, 679 F.2d 1115 (5th Cir. 1982), *amended in part, vacated in part on other grounds*, 688 F.2d 266 (5th Cir. 1982).

195.    Mr. Hope established a liberty interest due to his indefinite placement in solitary without eligibility for parole. *Hope v. Harris*, 861 F. App'x 571, 580 (5th Cir. 2021); *see also Wilkerson*, 774 F.3d at 853, 856 (recognizing that solitary confinement that causes "atypical and

significant hardship," including hardship due to an extraordinary length of time in segregation, is sufficient to demonstrate a liberty interest).

196.     Mr. Hope had a strong interest in meaningful review for placement in G.P. as opposed to solitary confinement.  Within prison systems, including TDCJ, the difference in treatment of and resources available to prisoners between solitary and G.P. is marked, including that G.P. provides social contact with others, space to move, and access to programming such as religious services and vocational training—which are significant in parole consideration.

197.     Mr. Hope faced a high risk of, and in fact experienced, an erroneous deprivation of this liberty interest through the procedures used: his SCC review hearings were a mere sham, with procedures that could be, and were repeatedly, tampered with at the whim of the Classification Defendants.

198.     From 1995 until 2022, Mr. Hope attended an SCC review hearing approximately every six months, or roughly 56 times, to have his classification reviewed.  Throughout that time, multiple SCC members told Mr. Hope that they saw no reason not to release him to G.P.  At least two SCC members, on three separate occasions, told Mr. Hope that they decided to release him. But, each time, the Classification Defendants or their co-conspirators interfered, citing that they lacked the power to actually authorize the change.  The SCC's decisions were inexplicably reversed by committees or administrators outside the appeals process and who Mr. Hope was not able to petition.  The Classification Defendants told Mr. Hope that there was nothing he could do to challenge this outcome and, as such, he would never get out of solitary.  Given that the decisionmakers at the dozens of hearings Mr. Hope attended lacked or disclaimed the authority to release him, such process amounted to nothing more than sham hearings.

199.    Classification Defendants Enloe, Bennett, and Fiveash, and others presiding over Mr. Hope's periodic reviews, did not articulate reasoning as to why he continued to be housed for years on end in segregation.  Instead, the Classification Defendants manufactured shifting and contradictory justifications for his continued segregation, including his long-ago escape and undocumented designations as "high profile" or "unusual and difficult."  Engaging only in perfunctory exchanges, the Classification Defendants never offered Mr. Hope an explanation of how or why these designations were applied, what they meant, or how they could be removed or challenged.  In essence, and as admitted by at least one SCC member, the SCC review hearings were mere "welfare checks" and little more than a rubber stamp on the Classification Defendants' pre-determined decision to keep Mr. Hope isolated—in short, sham decisions.

200.    Classification Defendants Echessa and White similarly received multiple letters, phone calls, emails, grievances, and pleas from Mr. Hope and his advocates, but each continued rejecting or ignoring Mr. Hope's claims of due process violations.  Both Mr. Echessa and Ms. White had supervisory authority over Mr. Hope's periodic review hearings and authorized the perfunctory review hearings that kept Mr. Hope in segregation without constitutionally adequate process.  As Mr. Treon told the media, the Director of Classification decided Mr. Hope "will *never get out* of Seg."  Mr. Echessa and Ms. White could have corrected these constitutional violations but instead allowed Mr. Hope to languish in solitary based on sham "hearings."

201.    Mr. Hope was released from solitary confinement only after he filed a petition for certiorari with the Supreme Court.  The alleged February 2022 review hearing where this release decision was made (of which Mr. Hope received no notice or decision) was scheduled irregularly and seemingly only as a litigation tactic to avoid liability for injunctive relief.

202.    Polunsky Defendant Rehse was part of the SCC panel at three of Mr. Hope's SCC review hearings that lacked due process.  Mr. Rehse also joined in a conspiracy to deprive Mr. Hope of his due process rights.  As a member of the conspiracy, Mr. Rehse shares in the responsibility for this constitutional deprivation.  *Bevill*, 26 F.4th at 283-84.

203.    Polunsky Defendant Rehse and the Classification Defendants knew Mr. Hope was entitled to periodic reviews of his confinement in solitary, and they acted with malice or reckless indifference to that right by, among other actions pled in the complaint, reversing SCC decisions to release Mr. Hope from solitary, disclaiming authority to release Mr. Hope from solitary, and failing to provide justification for Mr. Hope's indefinite confinement.

204.    Mr. Hope seeks compensatory and punitive damages against the Classification Defendants and Polunsky Defendant Rehse for the pain and suffering he faced while indefinitely relegated to segregation, with no ability to rejoin G.P. or be released on parole.

### FOURTH CLAIM FOR RELIEF

*Conspiracy Under 42 U.S.C. § 1983*
*(Polunsky Defendant Rehse and All Classification Defendants in their Personal Capacities)*

205.    Mr. Hope incorporates paragraphs 1 through 166 as though fully set forth herein.

206.    Conspiring to deprive someone of their constitutional rights is prohibited under 42 U.S.C. § 1983.  A plaintiff will prevail on a claim for conspiracy if he establishes: (1) an agreement among the alleged co-conspirators to deprive the plaintiff of a constitutional right and (2) that the alleged deprivation actually occurred.  *Bevill*, 26 F.4th at 274-75.

207.    Plausibly alleging conspiracy merely requires "enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."  *See id*. at 284; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  Evidence of a common motive among co-conspirators contributes to the plausibility of such a claim.  *Bevill*, 26 F.4th at 284 (holding that

plaintiff satisfied the pleading requirement on his conspiracy claim by alleging that co-conspirators were motivated to protect their reputations and had "worked closely with one another").

208.    A conspiracy claim under 42 U.S.C. § 1983 acts "as the legal mechanism through which to impose liability on each and all of the Defendants without regard to the person doing the particular act." *Nesmith v. Alford*, 318 F.2d 110, 126 (5th Cir. 1963).  Thus, "regardless of whether or not [a defendant's] actions alone actually caused a constitutional violation, liability can still be imposed on [his] alleged membership in [the] conspiracy."  *Latiolais v. Cravins*, 484 F. App'x 983, 991 (5th Cir. 2012).

209.    Additionally, "[a] coconspirator is bound by the overt acts of other coconspirators furthering the conspiracy both before and after being enlisted even though he may not participate in each overt act." *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 623 F. Supp. 2d 798, 830-31 (S.D. Tex. 2009) (quoting *U.S. v. Spudic*, 795 F.2d 1334, 1337 (7th Cir.1986)); *see also United States v. Rodriguez-Lopez*, 756 F.3d 422, 430 (5th Cir. 2014).

210.    The Classification Defendants and Polunsky Defendant Rehse conspired to deny Mr. Hope of his rights under the First and Fourteenth Amendments of the United States Constitution.

211.    The Classification Defendants, Polunsky Defendant Rehse, and their co-conspirators shared a common motive for retaliating against Mr. Hope: to protect their personal reputations and careers.  First, Mr. Hope's advocacy, both on his own and through outside advocates, invited public scrutiny to Defendants' and their co-conspirators' actions and threatened their personal and professional reputations.  Second, Defendants and their co-conspirators had personal vendettas against Mr. Hope, as they still harbored resentment due to Mr. Hope's escape in the early 1990s.  Mr. Hope's ability to outsmart the system was a huge embarrassment for those

67

whose profession it was to keep him incarcerated.  Third, once their misconduct had begun, Mr. Hope's willingness to file grievances and write letters to SCC, TDCJ, and state officials could lead to internal investigations and Defendants and their co-conspirators were motivated to protect their careers and reputations.

212.    The Classification Defendants and Polunsky Defendant Rehse worked closely with each other and with their co-conspirators.  All were employed in the same prison system and had the opportunity to easily meet and communicate with one another.  Further, many of the Defendants and co-conspirators reported to one another in the system's official hierarchy. Classification Defendant Echessa, for example, was Classification Defendant White's supervisor, who in turn was Classification Defendant Enloe's superior.

213.    Defendants and their co-conspirators sought to silence Mr. Hope by manufacturing reasons to keep him in solitary, inflicting pain and suffering, and breaking Mr. Hope's will to protest.

214.    Although they did not succeed in breaking Mr. Hope's will, Defendants actually denied Mr. Hope his rights under the First and Fourteenth Amendments of the United States Constitution.

215.    Since 2011, members of the conspiracy, in agreement with or at the direction of their co-conspirators:

    a.    Subjected Mr. Hope to sham hearings with a pre-determined outcome, denied their ability to release Mr. Hope from segregation, and reversed, or allowed to be reversed, SCC decisions requiring that Mr. Hope be released to G.P.;

    b.    Fabricated disciplinary cases in order to justify keeping Mr. Hope in solitary;

    c.   Confiscated Mr. Hope's typewriter, which he used to file grievances and communicate with advocates, and tampered with his legal communications and other advocacy-related documents;

    d.   Subjected Mr. Hope to a chemical agent, without allowing him to clean off the chemicals for multiple days, in order to deter Mr. Hope from further advocacy;

    e.   Moved Mr. Hope from cell to cell in order to disorient him and undermine his ability to advocate for himself;

    f.   Continued to rubber-stamp Mr. Hope's confinement in deplorable conditions, which were known to be harmful—for 17 additional years after any penological justification for keeping him in solitary confinement had evaporated—although they had the power to authorize Mr. Hope's move to G.P.

216.    The conspiracy to retaliate against Mr. Hope and deprive him of his due process rights spanned many years. All Defendants involved in any portion of the conspiracy are liable because of their membership in it.

217.    Polunsky Defendant Rehse and the Classification Defendants conspired to, and did, deprive Mr. Hope of his constitutional rights. In planning and executing their conspiracy, Polunsky Defendant Rehse and the Classification Defendants acted with malice or reckless indifference to Mr. Hope's rights by, among other actions pled in this complaint, agreeing "never" to release him, disregarding his requests for help, and fabricating disciplinary cases against him.

218.    Mr. Hope seeks relief in the form of compensatory and punitive damages against Polunsky Defendant Rehse and the Classification Defendants for the harm inflicted against him through their conspiracy to deprive him of his constitutional rights.

## FIFTH CLAIM FOR RELIEF

*Cruel and Unusual Punishment Under the 8th Amendment to the U.S. Constitution*
*Based on Excessive Force*
*(All Ellis Defendants in their Personal Capacities)*

219.    Mr. Hope incorporates paragraphs 1 through 166 as though fully set forth herein.

220.    As described, the Eighth Amendment, enforceable pursuant to 42 U.S.C. § 1983, prohibits "cruel and unusual punishments." U.S. Const. amend. VIII.  In claims under the Eighth Amendment arising from the use of excessive force, the "core judicial inquiry" is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm," or more simply, whether the defendant had a subjective intent to punish. *Cowart v. Erwin*, 837 F.3d 444, 452 (5th Cir. 2016) (citing *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992)). The official's intent in applying force is "determined by reference to the well-known *Hudson* factors—the extent of injury suffered, the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." *Id.* at 452-53 (internal quotation marks omitted).

221.    Ellis Defendants Simmons and Clark violated Mr. Hope's clearly established Eighth Amendment rights when they applied and maintained overly tightened handcuffs to Mr. Hope's wrists for more than 24 hours while he suffered from pneumonia and struggled to breathe. This use of excessive force caused Mr. Hope severe pain and lasting damage.

222.    Ellis Defendant Simmons was responsible for preparing Mr. Hope for an immediate transfer by ambulance.  Ms. Simmons knew Mr. Hope needed urgent medical care.  Despite that knowledge, Ms. Simmons took steps to delay his transfer.  After Sergeant Schwartz properly applied handcuffs to Mr. Hope's wrists, Ms. Simmons had the restraints removed so that she could

improperly reapply the handcuffs, this time clamping the metal so tightly that Mr. Hope's wrists and hands lost circulation, feeling, and their normal color.

223.    When Ellis Defendant Clark took control at the hospital, nurses pointed out to Mr. Clark multiple times that Mr. Hope's wrists and hands were discolored and losing circulation, and the nurses asked Mr. Clark why the handcuffs were so tight.  Mr. Clark responded only with vague references to having a reason for hurting Mr. Hope and with demands that the nurses let Mr. Clark handle security without questions.  For the next 24 hours, the restraints were not adjusted and Mr. Hope experienced severe discomfort, lost feeling in his wrists and hands, and his wrists bled.  The restraints were only corrected when a doctor involved Warden Strong to direct the handcuffs be applied correctly.

224.    The Ellis Defendants inflicted this pain on Mr. Hope wantonly and with complete disregard for the risk of harm their actions posed.  Each Ellis Defendant knew that Mr. Hope was experiencing respiratory distress requiring emergency medical attention, that the handcuffs were applied too tightly, and that the excessive restraint would or had caused Mr. Hope pain and discomfort and to lose color and feeling in his hands.

225.    The need for application of force was low.  Mr. Hope was in respiratory distress, was compliant, and was seeking necessary emergency medical care.  The Ellis Defendants knew the wrist handcuffs were only one of multiple security measures in place, as Mr. Hope was also in ankle and waist shackles and was accompanied by officers at all times.  Yet the Ellis Defendants made no efforts to temper their responses.  Their excessive use of force against Mr. Hope was done maliciously and sadistically and constituted cruel and unusual punishment.

226.    Mr. Hope suffers from lasting numbness and pain in his wrists and hands.

227.    The Ellis Defendants knew of the risks posed by an excessive use of force against Mr. Hope, and they acted with malice or reckless indifference towards Mr. Hope's rights by, among other acts pled in the complaint, applying and maintaining overly-tightened handcuffs to Mr. Hope's wrists for more than 24 hours, despite medical staff pointing out the deleterious effects.

228.    Mr. Hope seeks relief in the form of compensatory and punitive damages from Ellis Defendants Simmons and Clark for inflicting cruel and unusual punishment against him while he sought emergency medical treatment.

## PRAYER FOR RELIEF

**WHEREFORE**, Mr. Hope demands the following relief against Defendants, jointly and severally:

A.  Compensatory damages in an amount just and reasonable and in conformity with the evidence at trial;

B.  Punitive damages to the extent allowable by law;

C.  Nominal damages;

D.  Costs, expenses, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable laws; and

E.  Such other and further relief as the Court deems just and proper.

Dated: February 2, 2024

Respectfully submitted,

**MEHAFFY WEBER, P.C.**

/s/ *M.C. Carrington*_____

M.C. Carrington (State Bar No. 03880800)
P.O. Box 16
Beaumont, Texas 77704
Tel: (409) 835-5011
Email: m.c.carrington@mehaffyweber.com

**LATHAM & WATKINS LLP**

Michele D. Johnson (*pro hac vice*)
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
Tel: (714) 540-1235
Email: michele.johnson@lw.com

Heather A. Waller (*pro hac vice*)
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Tel: (312) 876-7700
Email: heather.waller@lw.com

**TEXAS CIVIL RIGHTS PROJECT**

Dustin Rynders (State Bar No. 24048005)
Molly Petchenik (*pro hac vice*)
Travis Fife (*pro hac vice*)
1405 Montopolis Drive
Austin, Texas 78741
Tel: (512) 474-5073
Email: dustin@texascivilrightsproject.org
        molly@texascivilrightsproject.org
        travis@texascivilrightsproject.org

*Attorneys for Plaintiff Dennis Wayne Hope*